### In re CARDIZEM CD ANTITRUST LITIGATION,

This Document Relates To: Charles Zuccarini, et al. v. Hoechst, et al., Case No. 98–74043.

No. 99–md–1278.
MDL 1278.

United States District Court,
E.D. Michigan,
Southern Division.

April 3, 2001.

Bruce R. Gerstein, Garwin, Bronzaft, New York City, for Cardizem CD.

Bruce E. Gerstein, Garwin, Bronzaft, New York City, Stephen Lowey, Lowey Dannen-

berg, White Plains, New York, for Sixteenth St. Community Health Center.

Elwood S. Simon, Elwood S. Simon Assoc., Birningham, MI, for Albert Eirich.

Joseph J. Tabacco, Berman, DeValerio, San Francisco, CA, for Aetna U.S. Healthcare and Aetna U.S. Healthcare of California, Inc.

Richard B. Drubel, Boies & Schiller, Hanover, NH, for Duane Reade, Inc.

Joseph J. Tabacco, Berman, DeValerio, San Francisco, CA, Elwood S. Simon, Elwood S. Simon Assoc., Birningham, MI, Michael G. Wassmann, Lance C. Young, Elwood S. Simon Assoc., Birmingham, MI, for State Law Plaintiffs.

Bruce E. Gerstein, Garwin, Bronzaft, New York City, Richard B. Drubel, Boies & Schiller, Hanover, NH, for Sherman Act Class Plaintiffs.

Joe Rebein, Shook, Hardy, Kansas City, MO, for Hoechst AG and Hoechst Aktiengesellschaft.

Craig L. John, Dykema Gossett, Bloomfield Hills, MI, Joe Rebein, Shook, Hardy, Kansas City, MO, for Hoechst Marion Roussel, Inc.

Norman C. Ankers, Honigman, Miller, Bingham Farms, MI, Colin A. Underwood, Hal S. Shaftel, Michael S. Lazaroff, Solomon, Zauderer, New York City, for Andrx Pharmaceuticals, Inc. and Andrx Corp.

Michael D. Hausfeld, Cohen, Milstein, Washington, DC, for Eugenia Wynne Sams.

Andrew J. McGuinness, Dykema Gossett Ann Arbor, MI, Craig L. John, Kimberly A. Bickersteth, Dykema Gossett, Bloomfield Hills, MI, for Aventis Pharmaceuticals, Inc.

Elizabeth J. Basten, Clark Hill, Detroit, MI, for Geneva Pharmaceuticals, Inc.

Elizabeth J. Basten, Clark Hill, Detroit, MI, Janis E.S. Foley, Cooper, Straub, Toledo, OH, Kathleen H. McGuan, Reed Smith, Washington, DC, Callin L. Hayes, Jackson, Walker, Dallas, TX, for Novartis Pharmaceuticals Corp.

George D. Ruttinger, Crowell & Moring, Washington, DC, for Humana, Inc., Pacificare Health Systems, Inc., RXSolutions, Inc., Health Net, Inc., and Health Net Pharmaceuticals Services, Inc.

Sarah M. Mathias, Jones, Day, Washington, DC, for Cigna Insurance Co., and Bayer Corp.

Elwood S. Simon, Elwood S. Simon Assoc., Birmingham, MI, Stephen Lowey, Richard W. Cohen, Lowey, Dannenberg, White Plains, NY, Angela K. Green, Niewald, Waldeck, Kansas City, MO, for Philip Neal.

Karen N. Walker, Kirkland & Ellis, Washington, DC, for Barr Laboratories, Inc.

Patrick E. Cafferty of Miller Faucher and Cafferty LLP, Ann Arbor, MI, for Charles Zuccarini, Albert Eirich and Jan Gabriel.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART STATE LAW PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EDMUNDS, District Judge.

### ORDER NO. 25

State Law Plaintiffs are indirect purchasers of Cardizem CD and its generic bioequivalents. This Court has decided to use Plaintiffs' Michigan action as an exemplar. Thus, the focus here will be on indirect purchasers in Michigan who are seeking: (1) equitable relief in the nature of disgorgement of Defendants' unjust enrichment; (2) treble damages, jointly and severally, for Defendants' violations of §§ 445.772[1] and 445.773[2] of the Michigan Antitrust Reform Act ["MARA"][3]; (3) costs of prosecuting this

---

**1.** Mich. Comp. Laws Annot. § 445.772 provides that: "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful."

**2.** Mich. Comp. Laws Annot. § 445.773 provides that: "[t]he establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant

market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful."

**3.** Mich. Comp. Laws Annot. § 445.778(2) permits indirect purchaser actions brought by persons alleging violations of §§ 445.772 or 445.773. It provides that:

"Any other person threatened with injury or injured directly or indirectly in his or her busi-

action, together with interest and reasonable attorneys' fees and costs; and (4) such other relief as the Court may deem proper. *See* Coor. 1st Am. Class Actions Complts. ["Complt."] at 66, Prayer for Relief in Michigan Action.

■ To successfully prosecute their monopoly claims, Plaintiffs must prove that Defendant HMRI: (1) possessed monopoly power in the relevant market; and (2) willfully acquired, maintained or used that power by anticompetitive or exclusionary means. *See Chase v. Northwest Airlines Corp.,* 49 F.Supp.2d 553, 565 (E.D.Mich.1999) (addressing the elements of a Section 2 Sherman Act claim). Monopoly power has been defined as the power to control or exclude competition, and its existence may be inferred when the defendant maintains a predominant share of the market. *See United States v. Grinnell,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Market power is determined by assessing whether the "seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *PSI Repair Serv., Inc. v. Honeywell, Inc.,* 104 F.3d 811, 816 (6th Cir.1997) (citing *Fortner Enter., Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)). Plaintiffs assert that their monopolization claims present common issues shared by the class that will predominate over any individual issues. Each class member has the common goal of establishing that: (1) HMRI was a monopolist in the United States market for Cardizem CD and its generic bioequivalents; and (2) HMRI willfully used or maintained that power by anticompetitive or exclusionary means. Plaintiffs further assert that the proofs on these claims are common to the class. Defendants do not challenge these assertions.

To successfully prosecute their antitrust claims alleging a conspiracy to restrain trade, Plaintiffs must prove three essential elements: (1) Defendants violated Michigan's antitrust laws; (2) Defendants' violation caused Plaintiffs to suffer some injury to their business or property (injury-in-fact or impact); and (3) "the extent of this injury can be quantified with requisite precision." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y.1996).[4] The first element has already been established. This Court has determined that the HMRI/Andrx Agreement entered into by Defendants in September 1997 is an agree-

ness or property by a violation of this act may bring an action for ... actual damages sustained by reason of a violation of this act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act." This Act took effect March 29, 1985. *See id.* The policy underlying Mich. Comp. Laws Annot. § 445.778(2) is reflected in a legislative response by the House Legislative Analysis Section in January 1985 to an argument opposing this *Illinois Brick* repealer provision:

"The federal precedent in this case is a controversial one. Several other states have chosen to diverge from it in statute, and there is a movement in the U.S. Congress to amend federal law to provide for indirect injury. Costs borne by a middleman as a result of anticompetitive activities are passed on to the consumer, even though the consumer does not buy directly from the violator. In the example cited above, a retailer forced to buy overpriced goods would protect himself or herself by raising retail prices to provide the normal markup and could, in addition, win damages from the

manufacturer in an antitrust action. It is only the ultimate purchaser who loses. Providing entitlement to damages to parties indirectly injured would simply be just.... Prosecution of an antitrust action is a highly technical and complex matter, so there is little likelihood that large numbers of these actions would be initiated by individual citizens, even with provisions of damages for indirect injury."

H.B. No. 4994 as enrolled Public Act 274 of 1984, Third Analysis at 3 (January 14, 1985).

4. The Michigan Antitrust Reform Act is patterned after the federal Sherman Antitrust Act, 15 U.S.C. § 1, et. seq., and Michigan courts have observed that federal court interpretation of the Sherman Antitrust Act is persuasive authority as to the meaning of the Michigan Antitrust Reform Act. *See Goldman v. Loubella Extendables,* 91 Mich.App. 212, 219, 283 N.W.2d 695, 698–99 (1979). *See also* § 445.784(2) of the Act which expressly provides that "[i]t is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason."

ment between horizontal competitors that allocates the entire United States market for Cardizem CD and its bioequivalents to Defendant HMRI, and thus constitutes a restraint of trade that has long been held illegal *per se* under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the state antitrust statutes at issue in this action. This Court further determined that the HMRI/Andrx Agreement constituted an illegal price fixing agreement. *See* Order No. 13, Mem. Op. & Order Granting Plaintiffs' Motions for Partial Summary Judgment dated June 6, 2000. The second and third elements remain at issue. These are the focal points of Defendants' challenge to Plaintiffs' motion for class certification which is presently before the Court.

Plaintiffs' motion seeks to have this case certified as a class action with the proposed class comprised of:

> all persons and entities who or which have paid and/or co-paid pharmacies in the Indirect Purchaser States for Cardizem CD and Cartia XT dispensed pursuant to doctors' prescriptions during the Conspiracy Class or Monopolization Periods.[5]

*See* Complt. at ¶ 17. Included in the proposed class are consumers (both cash payers and those with prescription drug coverage) and third-party health care benefit providers (such as managed care organizations, self-funded employers, and government programs like Medicaid) who have paid all or part of the supra-competitive prices consumer class members claim they were charged for their Cardizem CD and Cartia XT prescriptions in each of the Indirect Purchaser States. *See id.* at ¶ 18. Excluded from the classes are the Defendants, their officers and directors, their direct and indirect parent and subsidiary corporations and their officers and directors, and direct purchasers of Cardizem

CD and Cartia XT from Defendants, to the extent of such direct purchases. *See id.*

Plaintiffs' certification motion is brought pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiffs, as the party seeking to certify a class, bear the burden of showing Rule 23's requirements have been satisfied. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). The Court finds that Plaintiffs have not satisfied their Rule 23(b)(3) predominance burden as to: (1) persons who have not purchased a generic version of Cardizem CD during the relevant class period; and (2) persons with third-party health care benefits that allow them to pay the same fixed price for either brand-name or generic prescription drugs. Accordingly, the class is redefined to exclude these individuals. As redefined, Plaintiffs' allegations and proffered generalized evidence posit "class-wide injury resulting from every single member's overpaying" for their prescription drug purchases as a result of Defendants' illegal conduct. *See In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 82 (E.D.N.Y.2000). This action shall be maintained as a class action on behalf of the class as redefined. State Law Plaintiffs' motion for class certification is thus **GRANTED IN PART AND DENIED IN PART.**

### I. Facts

The named Michigan Plaintiffs are Charles Zuccarini ("Zuccarini"), a resident of Northville, Michigan, and Aetna U.S. Heathcare, Inc. ("Aetna"), a Pennsylvania corporation with a principal place of business in Pennsylvania. Plaintiffs allege that, during the class periods, Zuccarini paid pharmacies, without third party co-payment, to fill his prescriptions for Cardizem CD prior to August 1999

---

5. The conspiracy class period is defined as July 9, 1998 through such time that the effects of the Hoechst Defendants' and Andrx's agreement and conspiracy to delay competition have subsided. *See* Complt. at ¶ 17. The monopoly class period is defined as commencing on the earlier of the date following the Hoechst Defendants' November 8, 1996 withdrawal of their letter of reference that Biovail could otherwise have begun commercially marketing a generic bioequivalent

of Cardizem CD or September 15, 1997, the date the FDA preliminarily approved Andrx's generic bioequivalent of Cardizem CD and continuing through such time that the effects of defendants' anticompetitive conduct which delayed the entry of generic competition to Cardizem CD have been ameliorated through competition unaffected by the Hoechst Defendants' illegal and unfair business practices. *Id.*

and his prescriptions for Cartia XT after August 1999 when his physician authorized him to switch to the generic bioequivalent drug, Cartia XT. *See* Complt. at ¶ 9(e)(i). Plaintiffs further allege that Aetna provides health payment benefits to over 23 million people and has agreements with over 46,000 participating pharmacies in the United States. Subject to the terms and conditions of the managed care agreements covering its members, Aetna pays or copays the cost of most health services and products provided to its insureds, including costs for prescriptions for Cardizem CD and Cartia XT. During the class periods, Aetna paid Michigan pharmacies, for the benefit of thousands of its insureds, for all or part of the cost of these prescription drugs. *See id.* at ¶ 9(e)(ii).

In support of their motion for class certification, Plaintiffs contend that the injury or impact element of their antitrust claim is susceptible of class-wide proof. Plaintiffs assert that Defendants' illegal agreement delayed generic competition for Cardizem CD and thus caused all members of the proposed class to suffer the same injury; i.e., forced them to pay supra-competitive or monopoly prices for their purchases of Cardizem CD and its generic equivalents. Plaintiffs further assert that members of the class will continue to be damaged until there is a fair competitive market for Cardizem CD and its generic equivalents.

Plaintiffs' injury theory encompass two time periods: pre- and post-generic entry, which occurred in June of 1999. In the class period prior to generic entry, Plaintiffs allege, the delay of AB-rated generic competition for Cardizem CD caused all class members to suffer an economic injury because all were deprived of the ability to choose a less expensive generic version of Cardizem CD. Consequently, Plaintiffs argue, all end payers were uniformly impacted because all were forced to pay a supra-competitive or monopoly price for their Cardizem CD purchases.[6] Despite claiming that all class members were injured because all were deprived the ability

to chose a lower-cost generic alternative in the *pre-entry* period, Plaintiffs seek damages only for those class members who they claim would have switched to the generic version of Cardizem CD sooner than June of 1999 but for Defendants' anticompetitive conduct. If one or more generic versions of Cardizem CD entered the market prior to June of 1999, Plaintiffs argue, a predictable percentage of consumers would have switched to a less costly generic, yielding measurable savings to members of the proposed class of end payers. *See* Plfs. Rely at 1; 2/8/01 Hrg. Tr. at 66–68. Plaintiffs seek damages only for that percentage of consumers who they claim they can show would have switched to a generic sooner than June of 1999 but-for Defendants' illegal agreement. Accordingly, Plaintiffs argue, Defendants will not be held liable for any more antitrust injury than they caused.

In the class period after generic entry, Plaintiffs' argue, generics would have captured a predictably greater percentage of Cardizem CD purchases, and prices paid for these generic alternatives would have been lower by a predictable margin, thus yielding measurable savings for the proposed class of end payers. *See* Plfs. Reply at 1–2; Dr. Saha 6/15/00 Initial Report at 6–7. In the *post-entry* period, Plaintiffs seek damages for those class members who either did switch or would have switched to a generic version of Cardizem CD after it became available in June of 1999. Plaintiffs contend that, through the use of two widely accepted economic methods; i.e., the yardstick and before-and-after approaches, they can establish with reasonable accuracy: (1) the percentage of class members that would have switched to a generic version of Cardizem CD at any given point in time but-for Defendants' illegal conduct; and (2) the savings this percentage of switchers would have received but-for Defendants' anticompetitive conduct by paying a lower price for the generic drug. The measure of damages Plaintiffs propose focuses on the price differential

---

6. Plaintiffs assert that Cardizem CD and its generic bioequivalents are in essence the same drug product because FDA-approved generic versions of a brand name drug are fully substitutable for the brand. The only difference between the brand and the generic drug, Plaintiffs contend, is their price. The generic version is less expensive thus yielding measurable savings for end payers who are able to purchase generic alternatives to the brand name drug.

between the actual prices paid for class members' prescription drugs and the prices that would have been paid but-for Defendants' anticompetitive conduct.

Plaintiffs also contend that the economic damages resulting from Defendants' anticompetitive conduct can be assessed and quantified on an aggregate basis using widely accepted methodologies and existing data. Plaintiffs assert that damages may be determined on a class-wide or aggregate basis where there is a means to distribute damages to injured class members in the amount of their respective individual damages. Plaintiffs argue that such a means exists here; their expert has proposed a damage calculation that can be used to produce a reasonably accurate individual damage amount when used along with detailed claim forms.

Defendants challenge Michigan Plaintiffs' ability to satisfy the typicality and adequacy requirements of Rule 23(a) as well as their ability to satisfy the predominance and superiority requirements of Rule 23(b)(3) on both their antitrust and unjust enrichment claims. The Court first addresses Defendants' Rule 23(a) challenges. It then addresses their Rule 23(b)(3) challenges. The Court concludes with an analysis of Defendants' challenges to class certification of Plaintiffs' unjust enrichment claims.

## II. Standards for Determining Class Certification

Plaintiffs, as the party seeking to certify a class, bear the burden of showing Rule 23's requirements have been satisfied. *See Amchem Prods.*, 521 U.S. at 614, 117 S.Ct. 2231; *In re Am. Med. Sys.*, 75 F.3d at 1079. As observed by the Sixth Circuit, "[t]he district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based upon the particular facts of the case, should not be overturned absent a showing of abuse of discretion." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988). Nonetheless, the Court must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class." *In re Am. Med. Sys.*, 75 F.3d at 1078–79

(citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

In determining a motion for class certification, courts do not examine the merits of the plaintiffs' underlying claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). "A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claim." *Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D.Mich.1997). Courts also assume that the substantive allegations of the complaint are true and that cognizable claims are stated. *See Eisen*, 417 U.S. at 178, 94 S.Ct. 2140. "Nonetheless, the Court must undertake an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *Little Caesar*, 172 F.R.D. at 241. "[W]hen a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *Id.*

## III. Analysis

### A. Rule 23(a) Analysis

Fed.R.Civ.P. 23(a) contains four prerequisites that must be met before a court may certify a class. These prerequisites are known as the numerosity, commonality, typicality, and adequacy requirements. Defendants challenge Plaintiffs' ability to satisfy the typicality and adequacy requirements under Rule 23(a). There is no dispute as to the other requirements. Nonetheless, the Court must consider each factor.

#### 1. Numerosity

Fed.R.Civ.P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Defendants do not contest Plaintiffs' ability to satisfy the numerosity requirement. It is not a difficult burden. Plaintiffs need not prove the exact size of the proposed class, but rather must demonstrate only that the number is sufficiently large so as to make joinder impracti-

cable. "A finding of numerosity may be supported by common sense assumptions, and it is especially appropriate in antitrust actions brought under Rule 23(b)(3)." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 239 (E.D.N.Y.1998) (citing 4 *Newberg on Class Actions,* § 18.03, n. 17 (2d ed.1985)).

Plaintiffs have fulfilled their burden here. They indicate that public data reveals that over 13 million prescriptions for Cardizem CD were filled in the United States in 1998 alone. Accordingly, it is reasonable to assume that there are thousands of class members in Michigan and to further assume that joinder would be impracticable.

### 2. Commonality

■ The commonality prerequisite of Rule 23(a)(2), requiring that "there be questions of law or fact common to the class", is also satisfied. Defendants do not challenge this conclusion. This test requires only some common questions; not a predominance of common questions as required under Rule 23(b)(3). It is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Sys.,* 75 F.3d at 1080 (internal quotes and citation omitted). Not every common issue will suffice. Courts look for common issues where resolution will advance the litigation. *See Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998).

Plaintiffs allege here that each member of the proposed class was injured by Defendants' illegal agreement which fixed prices and allocated the entire United States market for Cardizem CD and its generic bioequivalents. Common questions of law and fact include whether Defendants' conduct caused injury to Plaintiff class members; and, if so, a determination of the appropriate damages. Resolution of these common issues will advance this antitrust litigation. "It is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 240 (citing cases).

### 3. Typicality

Fed.R.Civ.P. 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Defendants challenge Plaintiffs' ability to satisfy this requirement arguing that each class member's ability to prove its claim will depend on the unique facts surrounding that class member's payment for its prescriptions for Cardizem CD and/or its generic alternatives. Defendants misconstrue Plaintiffs' burden under Rule 23(a)(3).

"The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." *Gen. Tel. Co. v. E.E.O.C.,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). " '[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *In re Am. Med. Sys.,* 75 F.3d at 1082 (quoting 1 *Newberg on Class Actions,* § 3–13, at 3–76 (footnote omitted)). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (citing 1 Newberg, *supra,* § 3.13, at 3–75). Courts considering this prerequisite have observed that "claims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 241 (citing *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 691 (D.Minn. 1995)).

Here, as in other antitrust price-fixing cases, Plaintiffs' claims and the claims of the absent class members arise from the same events, involve the same legal theory, and the same elements of proof. Therefore, the interests of the class representatives and the absent class members are sufficiently aligned. Defendants' challenges to the typicality of Plaintiffs' claims are not persuasive. "Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certifi-

cation." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 242.

#### a. Zuccarini

Mr. Zuccarini purchased Cardizem CD in the period prior to generic entry. He switched from Cardizem CD to a generic alternative, Cartia XT, within a few months after generic entry when his physician authorized him to do so. *See* Complt. at ¶ 9(e)(i); 2/8/01 Hrg. Tr. at 146. That Zuccarini paid cash for his Cardizem CD and Cartia XT prescriptions does not defeat the representative nature of the class action. Typical of the claims of the absent class members, he claims he was forced to pay a supra-competitive price for Cardizem CD in the pre-entry time period as a result of Defendants' antitrust violations. Similarly, like other class members, he claims he continues to suffer damages because he is forced to pay higher prices for Cartia XT in the post-entry time period due to Defendants' antitrust violations.

■ "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 242. Despite Defendants' arguments to the contrary, " 'there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members.' " *Id.* (quoting *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1036 (N.D.Miss. 1993)). Mr. Zuccarini's cause of action arises from the same conduct that gives rise to the claims of the class. His interests and the interests of the class "in pursuing the class claims are very similar, if not identical." *Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.*, 182 F.R.D. 500, 510 (W.D.Mich. 1998). That individual class members will receive varying damage amounts for their claimed injury does not defeat class certification. "Typicality ... does not require that the situations of the named representatives and the class members be identical." *In re NASDAQ*, 169 F.R.D. at 511. *Accord In re Synthroid Mktg. Litig.*, 188 F.R.D. 295, 299 (N.D.Ill.1999) (observing that factual distinctions between the claims of class representa-

tives and other class members does not preclude a finding of typicality).

#### b. Aetna

Defendants also argue that Aetna's interests as a third-party payer inherently conflict with the interests of consumers because Aetna might seek to maximize its damages to the detriment of consumer class members. Defendants' arguments that antagonistic interests exist within the proposed class are best analyzed under the adequacy requirement. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 692.

#### 4. Adequacy

■ Fed.R.Civ.P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement is essential to due process as a final judgment is binding on all class members. *See Hansberry v. Lee*, 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940). To satisfy this requirement Plaintiffs must show that: (1) the representatives' interests do not conflict with the class members' interests, and (2) the representatives and their attorneys are able to prosecute the action vigorously. *See In re NASDAQ*, 169 F.R.D. at 512.

#### a. Conflicts of Interest

■ As to the first issue, there is no inherent conflict between the named representatives and the proposed class members. Defendants argue that Mr. Zuccarini's interests conflict with those of absent class members who do not pay cash for their prescriptions. A similar argument was rejected in *In re South Central States Bakery Products Antitrust Litig.*, 86 F.R.D. 407 (M.D.La. 1980). There, the court observed that the adequacy requirement was fulfilled where the named representative and the absent class members similarly assert that they were injured by the same illegal conduct on the part of the defendants.

Defendant argues that because [the named representative] never received a discount, and never entered into any other special pricing arrangement, his interest as a purchaser at straight wholesale list price was

antagonistic to the interests of other class members who were different types of purchasers. Plaintiff, however, is asserting by his price fixing claim that the wholesale bakery companies illegally agreed to fix prices for each of the types of purchasers included in the proposed class. Plaintiff claims that each type of purchaser within the defined geographic area who bought at prices that were illegally fixed by the bakeries' combination or conspiracy was injured by the conspiracy, even though these purchasers bought through different pricing mechanisms. If, as plaintiff contends, the prices of bakery goods paid by each type of purchaser were illegally fixed, there would be no antagonism between the interests of [the named representative] and the class members.

*Id.* at 418. The same analysis and result apply here.

■ Defendants' "potential conflict" argument as to Aetna likewise fails. Defendants argue that Aetna's interests as a third-party payer may conflict with the interests of consumers because Aetna will presumably seek to maximize its damages to the detriment of consumer class members. The courts have rejected similar arguments about hypothetical conflicts, finding them insufficient to defeat class certification. As observed in *In re NASDAQ*, "[t]he conflict to which Defendants refer relates only to the apportionment of damages as between [proposed class members]. Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation." 169 F.R.D. at 512. Each class member "has the same interest in maximizing the aggregate amount of class-wide damages." *Id.* "A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit." *In re S. Cent. States Bakery Prods.*, 86 F.R.D. at 418.

This Court has considerable flexibility under Rule 23 to deal with conflicts if and when they arise. *See In re NASDAQ*, 169 F.R.D. at 512. *See also Rivera v. Wyeth–Ayerst Labs.*, 197 F.R.D. 584, 590 (S.D.Tex.2000) (observing that "[i]n the unlikely event that a

conflict does occur over allocation of damages", the Court can, pursuant to Fed. R.Civ.P. 23(c)(4)(A), "divide the class into two subclasses consisting of consumers and insurers"). Defendants' arguments about potential conflicts are insufficient to deny class certification. "[I]n order to warrant denial of class certification, it must be shown that any asserted 'conflict' is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation. Defendants have not made this showing." *Id.* at 514–15.

■ Likewise, the mere fact that Mr. Zuccarini's son is employed as an associate with liaison counsel, Elwood S. Simon & Associates, P.C., is insufficient to create a conflict of interest and thus render him an inadequate class representative. As the courts routinely observe, a named plaintiff will not be disqualified simply because of a close or familial relationship with one of the attorneys representing the class. *See Lewis v. Goldsmith*, 95 F.R.D. 15, 20 (D.N.J.1982) (observing that "it would seem a bit anomalous that an individual whose uncle has developed a reputation as a competent securities lawyer should be prohibited from turning to his uncle for assistance if he has a legitimate claim"). Rather, there must be some evidence that the relationship at issue is likely to create a conflict of interest or otherwise compromise the ability to vigorously prosecute the action on behalf of the class. The concern is that the financial interests of the class representative may conflict with those of the class; e.g., he may seek a settlement that is not good for the class as a whole. *See Irvin E. Schermer Trust by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 337–38 (D.Minn.1987). *See also In re Greenwich Pharm. Sec. Litig.*, No. 92–3071, 1993 WL 436031, *2 (E.D.Penn.1993) (finding that "a close familial relationship" alone is insufficient to disqualify a representative plaintiff and concluding that the father of an attorney in one of the firms representing plaintiffs was an adequate class representative). Defendants have not presented any evidence that the challenged relationship will create a conflict of interest or otherwise compromise Mr. Zuccarini's ability to vigorously prose-

cute this action on behalf of the class. As Plaintiffs point out, only Co–Lead Counsel have strategic and settlement authority in this case; not liaison counsel. Moreover, the fact that the courts have the power to review settlement agreements for fairness will further protect any potential conflict that may arise in that context.

Defendants' reliance on *Grigg v. Michigan National Bank*, 405 Mich. 148, 274 N.W.2d 752 (1979) is misplaced. In *Grigg*, the Michigan Supreme Court concluded that "the relationship between a class representative and the attorney or attorneys handling the case can be *a relevant consideration* in assessing the requirement of adequate representation. If that relationship would impair the representation of the absent class members, it *can be* the basis for a ruling that the requirement of adequate representation has not been met." *Id.* at 765–66 (emphasis added). The *Grigg* Court did not hold that the plaintiff's status as secretary for class counsel precluded her from acting as a named plaintiff. Rather, the Court held that this fact, combined with others, "would justify a searching examination of the relationship between the plaintiff and her attorneys *and if* such examination revealed that this relationship would interfere with her representation of the class, the class portion of the suit could be dismissed." *Id.* at 766 (emphasis added). Accordingly, the case was remanded for further proceedings consistent with the Court's opinion. *Id.* at 757, 771.

### b. Ability to Vigorously Prosecute the Litigation

As to the second criteria, Defendants' arguments likewise miss the mark. Defendants argue that Plaintiffs cannot satisfy the adequacy requirement because Mr. Zuccarini lacks sufficient knowledge or interest in the outcome of this case. The courts have routinely rejected similar arguments. "Courts do not require the representative plaintiff to be the best of all possible plaintiffs or to be especially knowledgeable, intelligent, or possessing a detailed understanding of the legal or factual basis on which a class action can be maintained." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 242.

To require otherwise, "would reduce the class action device, especially in complicated antitrust cases, to an impotent tool." *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1037.

Defendants do not object to the ability and competence of Plaintiffs' counsel. Rather, they question counsel's motivation in prosecuting this action and counsel's loyalty to its clients. From that query, Defendants' bootstrap an argument that Aetna is not the moving force behind this litigation and thus will not vigorously prosecute it. The Court is not persuaded by Defendants' arguments. Plaintiffs present compelling evidence that Aetna has been and remains a key force in pursuing this litigation, that it has the incentive to present evidence that will establish that Defendants' antitrust violations injured it and all class members, and that it will vigorously prosecute this litigation on behalf of the class. *See* Plfs. Reply, Ex. X, Declaration of Gerald Lawrence, Aetna counsel (refuting the claim that Biovail (Andrx's competitor) not Aetna is the moving force behind this litigation).

Plaintiffs also refute Defendants' arguments that the Lowey Dannenberg firm cannot adequately represent the Plaintiffs' interests because its loyalties are to its former client, Andrx's competitor Biovail, and not to Aetna, its current client. *See* Plfs. Reply, Ex. Y, Declaration of Stephen Lowey (explaining the firm's relationship with Biovail and Plaintiffs in this action; averring that the firm was hired by Biovail in July 1998 with regard to class actions in Florida and Alabama and was hired by the California Plaintiffs in this action in August 1998 but terminated all relationships with Biovail prior to filing the *Betnor* complaint in California; explaining that it hired the Public Relations firm Sitrick & Co. to handle publicity about the *Betnor* action and terminated that relationship after an article about the case appeared in *The Wall Street Journal;* explaining that it had nothing to do with Biovail's alleged media plan; and denying that Biovail is the true motivating force behind this class action suit). "Adequacy of representation merely requires that the class representative's attorney be qualified, and that the class representatives not have interests conflicting

with the class in the litigation at hand." *In re NASDAQ,* 169 F.R.D. at 515. Plaintiffs attorneys are qualified lawyers with experience in handling complex class actions such as this and do not have interests that conflict with or interfere with those of the class they represent. Accordingly, this Court finds that Plaintiffs have fulfilled this and all the requirements of Rule 23(a).

In addition to satisfying all the criteria of Rule 23(a), Plaintiffs must also satisfy the requirements of Rule 23(b)(3). The parties focus on Rule 23(b)(3)'s predominance requirement, and the Court addresses that issue first. It then turns its attention to Rule 23(b)(3)'s superiority requirement.

## B. Rule 23(b)(3) Analysis

The Court's task under Rule 23(b)(3) is to determine whether common questions of law or fact predominate over individual ones and whether the proposed class action is superior to other available methods of adjudication. "[T]he Court must scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 684 (N.D.Ga.1991).

### 1. Predominance

■ "There are no bright lines for determining whether common questions predominate. Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position. Common questions need only predominate: they need not be dispositive of the litigation." *In re Potash Antitrust Litig.,* 159 F.R.D. at 693 (internal citations omitted). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ,* 169 F.R.D. at 517.

In determining whether Rule 23(b)(3)'s predominance requirement is satisfied here, this Court must consider yet distinguish: (1) how Plaintiffs intend to prove that Defendants' illegal agreement caused all class members to pay a supra-competitive price for Cardizem CD in the pre-entry period (fact of injury); (2) how Plaintiffs intend to prove in the post-entry period that, but-for Defendants' illegal agreement, many more Cardizem CD purchasers would have switched to a generic alternative and would have paid lower prices than they actually did (fact of injury); (3) how Plaintiffs' intend to measure the damages flowing from these injuries (damage amount); and (4) whether the evidence is common to the class or unique to individual class members. The Court will examine first the proofs as to the impact or fact of injury element of Plaintiffs' case, and then will consider Plaintiffs' proofs as to the damage element.

### a. Susceptibility of Impact to Class–Wide Proof

#### (1) Plaintiffs' Burden at Class Certification Stage

The fact of injury or "impact" is an essential element of Plaintiffs' antitrust claims and requires proof that Plaintiffs suffered some injury that was caused by Defendants' antitrust violations. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114, n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Martino v. McDonald's Sys., Inc.,* 86 F.R.D. 145, 147 (N.D.Ill.1980). "The fact of injury may be established by inference or circumstantial evidence." ABA Section of Antitrust Law, *Antitrust Law Developments* (4th ed.1997) at 783 (citing *Zenith,* 395 U.S. at 125, 89 S.Ct. 1562; *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 700, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

If generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class member's individual circumstance as Defendants claim. Such an examination will relate to the quantum of damages; not the fact of injury. *See Zenith Radio Corp.,* 395 U.S. at 114, n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (observing that the antitrust plaintiff's "burden of proving fact of damage under § 4 of the Clayton

Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage."). *Accord Martino*, 86 F.R.D. at 147 (observing that the "[f]act of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief"); *B.W.I. Custom Kitchen v. Owens–Illinois, Inc.*, 191 Cal.App.3d 1341, 1350, n. 7, 235 Cal.Rptr. 228, 234, n. 7 (1987). To show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 618 (N.D.Ga.1997) (observing that "Plaintiffs must show that antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs need not show antitrust impact in fact occurred on a classwide basis").

### (2) Plaintiffs' Arguments and Proffered Common Evidence on Impact

Plaintiffs assert that, prior to the June 1999 entry of generic competition, all class members were injured because all were forced to pay a supra-competitive or monopoly price for Cardizem CD. Plaintiffs' common injury argument is based on the following premises. Cardizem CD and its generic bioequivalents are two versions of the same drug product because FDA-approved generic versions of a brand name drug are fully substitutable for the brand. The only difference between the brand and the generic drug is their price. The generic version is less expensive thus yielding measurable savings for end payers who are able to purchase generic alternatives to the brand name drug. Defendants' HMRI/Andrx Agreement, which delayed generic competition for Cardizem CD, prevented consumers from being able to choose a less-costly generic alternative for their Cardizem CD purchases. Because it precluded consumers from choosing a less expensive generic, the HMRI/Andrx Agreement allowed HMRI to maintain a monopoly position in the United States market for Cardizem CD and its generic bioequivalents, forced consumers to pay a higher monopoly price for their Cardizem CD prescriptions in the pre-generic entry time period and thus caused them to suffer an economic injury. *See* Dr. Saha 8/1/00 Rebuttal Report at 3. If one or more generic versions of Cardizem CD entered the market prior to June of 1999, Plaintiffs argue, a predictable percentage of consumers would have switched to a predictably less costly generic, yielding measurable savings to members of the proposed class of end payers.

Plaintiffs further assert that, in the time period after generic entry, class members continue to suffer injury as a result of Defendants' illegal conduct. Had generic competition not been delayed, Plaintiffs argue, many more Cardizem CD purchasers would have switched to a generic alternative for Cardizem CD at any point in time throughout the class period, and they would have paid lower prices than they actually did for their generic drugs.

Plaintiffs do not argue or proffer generalized evidence that the price of the brand name drug, Cardizem CD, would have been lower had generic competition not been delayed by Defendants' illegal agreement.[7] Plaintiffs' expert Dr. Saha admits that: (1) an individual who would not have switched to a generic version of Cardizem CD would not have paid a supra-competitive price unless it is shown that the price for Cardizem CD would have been lower in the event of generic entry; and (2) his analysis thus far revealed that the price of Cardizem CD after generic entry has not decreased but rather has increased in amounts that reflect the four or five percent inflation-based increases that were typical in the pre-generic entry time period. *See* 2/8/01 Hrg. Tr. at 31–34, 50–52, 65–68.

In support of their injury argument, Plaintiffs assert that: (1) generic market penetration rates follow a predictable pattern;

---

7. Plaintiffs insist that the price of Cardizem CD after generic entry is not the benchmark for competitive price levels. *See* Saha 8/1/00 Rebuttal Report at 3. It is Plaintiffs' position that the but-for price of Cardizem CD is probative only of what the but-for entry price for Cartia XT would have been. *See* 2/8/01 Hrg. Tr. at 147–48.

(2) the bigger the brand name drug, the faster generics penetrate the market; (3) generics ultimately capture 90 percent of the brand name drug's original market share; (4) at the point of entry, the price of the generic drug is substantially less than the price of the brand; (5) both the market share of the generics and the price differential between the generic and brand drugs increase over time; (6) generic market share increases and the price of generics decreases upon entry of the second and third generic versions of the brand name drug; (7) the rapid erosion of the brand drug's market share is attributable to the price difference between Cardizem CD and its AB-rated generics; and (8) the price differential between the brand and the generic drugs at the manufacturer level is passed on to the retail level and translates into significant savings to end-payers. *See* Plfs. Expert Dr. Saha's 6/15/00 Initial Report at 3–7; Saha 8/1/00 Rebuttal Report at 3–10; Saha 11/3/00 Sur–Rebuttal Report at 3–7.

Plaintiffs proffer the following generalized evidence in support of their claim that all putative class members suffered an injury in fact as a result of Defendants' illegal conduct:

(1) Cardizem CD and its AB-rated generic equivalents are interchangeable versions of the same prescription drug product. *See e.g.,* FDA (2000) Approved Drug Products with Therapeutic Equivalence Evaluation ["Orange Book"]; government and academic studies detailing consumer switching rate after generic entry; and actual evidence of consumers switching from Cardizem CD to generic alternatives after generic entry.

(2) Entry of a generic drug on the market results in significant savings for end payers and greater market share for the generic drug because the vast majority of consumers choose the lower-cost generic rather than the higher-priced brand-name drug and thus save money. *See e.g.,*Dr. Saha's 6/15/00 Initial Report, 8/1/00 Rebuttal Report, and 11/3/00 Sur–Rebuttal Report (reaching this conclusion); government and academic studies listed in Dr. Saha's 6/15/00 Report (examining the effect of generic competition in the pharmaceutical industry and concluding that generic entry and substitution play a key role in facilitating price competition in this industry); Richard P. Rozek & Ruth Berkowitz "The Costs to the U.S. Health Care System of Extending Marketing Exclusivity for Taxol," *Journal of Research on Pharmaceutical Economics,* Vol. 9(4) (1999).

(3) Defendants examined similar data and used methodology substantially similar to that of Plaintiffs' expert, Dr. Saha, to forecast the economic effects of generic competition for Cardizem CD.

*See e.g.,* Plfs. Reply Ex. P, 7/28/00 HMRI Press Release (noting a 62.8% decline in Cardizem CD sales "which had been expected due to the onset of generic competition in the U.S."); Plfs. Reply Ex. Q, 7/20/00 Press Release (predicting future Cardizem CD losses due to generic competition); Plfs. Reply Ex. S, FTC Dep. Testimony of HMRI's Kelly Blinzler (forecasting generic penetration rate); Plfs. Reply Ex. U, Dep. Testimony of HMRI counsel Edward Stratemeier (explaining how the Andrx "lost profit" figure was negotiated in the HMRI/Andrx Agreement); Plfs. Reply Ex. V, FTC Dep. Testimony of Andrx's Karen Rice (forecasting the market share Andrx's generic would capture from Cardizem CD); Plfs. Ex. A from 2/8/00 Hrg., 6/16/00 Testimony of Frank Ciriello, Cardizem CD Product Manager, in action pending in the United States District Court for New Jersey, *Biovail Corp. Int'l v. Hoechst AG, et al,* Civ. No. 98–1434 (explaining how HMRI forecast the effects of generic entry on Cardizem CD's market share, testifying that in hindsight the forecast was a pretty accurate description of what actually occurred once generic competition entered the market, and testifying that all generic penetration curves reach 90% of the market share and the greater the number of generics on the market the quicker that 90% mark is achieved); Plfs. Ex. B from 2/8/00 Hrg., Wilkerson Group 12/31/97 Report (forecasting the effects of generic competition to Cardizem CD including generic penetration rates and the impact on Cardizem CD sales under a number of generic entry scenarios).

(4) Price savings at the manufacturer (direct purchaser) level are passed-on to the retail level and translate into savings to end-payers. The average wholesale price ("AWP") or list price of Cardizem CD and its AB-rated generic bioequivalents is the base price from which all discounts, rebates, reimbursements, and price negotiations, if any, are derived. The AWP of Cardizem CD is greater than the AWP of the generic at the manufacturer level and this price differential is passed-on and reflected at the retail level.

*See e.g.,* Dr. Saha 8/1/00 Rebuttal Report and Ex. 4A–4C (concluding that price savings at the manufacturer level are passed-on to the retail level and translate into savings to end-payers based upon his use of widely-accepted economic methodology and existing data); Plfs. Ex. C from 2/8/01 Hrg., Drugstore.com, Cardizem CD and generic bioequivalent price quotations (showing substantial price savings for generic version of Cardizem CD); 2/8/01 Hrg. Tr. at 89–91 (Defendants' expert Dr. Snyder testified that he agreed that the first generic manufacturer to enter the market looks to the brand-name drug's list price and sets the generic's list price at the point of entry at about 60% to 70% of the brand-name manufacturer's list price and that the second and third generics enter the market at an even lower list price than the brand).

(5) In virtually all prescription drug transactions, the price for Cardizem CD was greater than the price for its generic alternatives at the retail level.

*See e.g.,* Dr. Saha 11/3/00 Sur–Rebuttal Report at 5–7; 2/8/01 Hrg. Tr. at 47–50 (Dr. Saha's testimony that additional analysis on a store-by-store basis of the two most commonly prescribed doses of Cardizem CD and its generic alternatives revealed that the brand price was greater than the generic price 96% and 98% of the time respectively).

(6) Reliable data exists regarding prescription drug sales and regarding manufacturer prices and retail prices for Cardizem CD, Cartia XT and other generic versions of Cardizem CD because (a) federal and state law requires Michigan pharmacies to keep records for the last five years of all prescription drug sales; *see* Mich. Comp. Laws Annot. § 333.17752; (b) detailed data is compiled by the marketing database firm IMS America; (c) Defendants and third-party payer class members have records of relevant prescription drug sales and prices; and (d) the list price or average wholesale price for Cardizem CD and Cartia XT is reported by two private data collection firms, Medispan and First Data Bank (*See* Plfs. Reply Ex. M, Fogle Affidavit, ¶ 2).

Plaintiffs admit that there is not a 100 percent switchover from Cardizem CD to the lower-cost generic alternative. *See* 2/8/01 Hrg. Tr. at 115. Nonetheless, they assert that their proposed methodology, which uses well-established economic methods, will account for that percentage of purchasers who would, at any given period of time, remain loyal to the brand-name drug even though the generic is chemically the same product. Despite claiming that all class members were injured because all were deprived of the ability to choose a lower-cost generic alternative in the pre-entry period, Plaintiffs seek damages only for that percentage of the proposed class that they show would have switched to a generic and saved money on their prescription drug purchases but-for Defendants' illegal agreement. Because Defendants will not be held accountable for any more antitrust injury than they caused, Plaintiffs argue, the class as defined should be certified. *See* Plfs. Reply at 3; Saha 8/1/00 Rebuttal Report at 4–7; 2/8/01 Hrg. Tr. at 58. Any uncertainty as to the identity of proposed class members who would or would not have switched to a generic in the but-for world, Plaintiffs argue, was created by Defendants' illegal conduct and should be construed against them.

### (3) Defendants' Challenges

Defendants contend that individual issues among class members will predominate because: (1) Michigan law does not allow for a presumption of injury merely from proof of an antitrust violation; and (2) Plaintiffs' class-wide proof and its aggregate measures of impact and damages do not accurately

account for variables that will affect whether and to what extent an individual class member was injured. Defendants' position, as summarized by their expert Dr. Snyder, is as follows:

> If the person would have switched and they would have gotten a lower price after switching, ..., taking into account prescription benefit terms and retail pricing practices, I would say that person would have been injured.

> The delay in switching would have affected the amount of damages, but as long as they would have switched and would have benefitted from a lower... but-for price for Cartia, then they would have been injured. And the delay that you described in Mr. Zuccarini's case would affect damages.

2/8/01 Hrg. Tr. at 95. *See also* 2/8/01 Hrg. Tr. at 99.

Thus, to prove injury allegedly caused by their antitrust violation, Defendants' argue, Plaintiffs must account for the following variables: (1) switching behavior; i.e., whether an individual class member would have chosen a generic alternative over Cardizem CD in the but-for world; (2) differences in pass-on behavior along the distribution chain and retailer pricing behavior that might result in the consumer or the third-party class member paying no less for the generic than the brand-name drug in the but-for world; and (3) differences in prescription drug health benefits that might result in the consumer paying no less for the generic than the brand name drug; i.e., fixed co-payment terms. Defendants identify additional variables affecting third-party payers: (4) whether the third-party payer passed on to its insureds any injury it may have suffered in the form of increased premiums (defensive use of pass-on theory); and (5) whether the third-party payer could have but failed to mitigate its damages.

#### (4) Analysis

▪ The Court first addresses Defendants' arguments about the need for individual proof as to each class member's switching behavior. It then addresses Defendants' arguments about variables affecting the net prices paid for prescription drugs. Finally, it addresses Defendants' mitigation and pass-on defenses.

#### (A) Switching Behavior: Generalized Evidence Exists to Show Impact on a Class–Wide Basis for Those Class Members Who Have Chosen the Generic Over the Brand–Name Drug

Defendants argue that individual analysis is necessary to determine whether each consumer class member would have chosen a generic alternative over Cardizem CD in the but-for world. A failure to do so, Defendants assert, means they cannot show that they in fact suffered an injury as a result of the HMRI/Andrx Agreement which delayed generic competition, foreclosed their opportunity to choose a less costly generic alternative to Cardizem CD, and forced them to pay a higher price for their prescription drugs. Defendants' arguments are persuasive only as to those putative class members who have not purchased a generic alternative to Cardizem CD in the relevant class period.

Plaintiffs' injury-in-fact argument is dependent upon a determination that "non-switching" consumers would have taken advantage of a lower priced generic but-for Defendants' illegal conduct. Evidence that class members have purchased a generic version of Cardizem CD after it became available gives rise to the inference that they would have similarly done so in the "but-for" world at the "but-for" price. There is no need for individual analysis of switching behavior as to these putative class members. The same cannot be said for those consumers who do not switch and who remain brand-loyal. Accordingly, the Court redefines the putative class to include only those consumer class members who purchased a generic alternative to Cardizem CD in the relevant class period.

The Court next considers Defendants' arguments that differences in pass-on behavior along the distribution chain, retailer pricing behavior, and each putative class member's health care benefits preclude Plaintiffs from proving class-wide injury even as to those

consumers who do choose a generic alternative for Cardizem CD.

### (B) Variables Affecting the Net Price Paid for Prescription Drugs Relate to the Amount of Injury; Not the Fact of Injury

Defendants argue that "[e]ven if HMRI's and Andrx's activities resulted in some or all direct purchasers paying higher prices than they would have paid had a generic alternative to Cardizem CD been available earlier", this might or might not have affected end-payer class members because retailers may not have passed-on that price increase. Determining whether and to what extent price increases have been passed on, Defendants argue, requires a complicated analysis of the chain of distribution for each transaction as well as an examination of each retailer's pricing behavior. *See* Defs. Response at 13–14. If the net price end-payers actually paid for their prescription drugs is not greater than the net price that they would have paid in the "but-for" world, Defendants conclude, then there is no injury in fact.

### (i) Pass–On Behavior; Tracing "Overcharges" Through the Distribution Chain

Plaintiffs proffer generalized evidence showing that the price differential between Cardizem CD and its AB-rated generics at the manufacturer (direct purchaser) level is passed on to the retail level and translates into significant savings to end-payers.[8] Rather than tracing overcharges as they are passed through the chain of distribution, Plaintiffs intend to use a "bottom across" approach which obviates the complexities Defendants cite in their "top down" approach. "Bottom across" means that the overcharge is determined by examining the price differential between the generic and the brand drug at the retail level only. Thus, there will be no need to review "pass-through" variations.

In support of their simplified approach, Plaintiffs proffer commentary by Defendants'

expert in the direct purchaser case. Dr. Blair observed in a December 1999 article that:

> [a]n indirect purchaser must estimate only the "but for" price that it should have paid, which is a far less exacting exercise than apportioning the overcharge throughout the entire chain of distribution.
>
> To be sure, estimating the requisite "but for" price at the consumer stage ... would not be easy because a great number of factors may affect that price. [footnote omitted]. Still, any general fear of the difficulties indirect purchasers may experience in calculating the "but for" price to determine the overcharge can be overstated.... In fact, the determination of a "but for" price by indirect purchasers in price-fixing cases may be even simpler than in many other instances because the violation itself directly affects price in an obvious way. In the case of other violations, the impact on price is less obvious.

Roger D. Blair and Jeffrey L. Harrison, *Reexamining the Role of Illinois Brick in Modern Antitrust Analysis,* 68 Geo. Wash. L.Rev. 1, 29 (1999). Dr. Blair also observed that the complexities associated with a "topdown" pass-on analysis are greatly overblown. *See id.* at 29–30.

### (ii) Retailer Pricing Behavior

Despite differences in retail pricing behavior, Plaintiffs assert that in virtually all prescription drug transactions, the retail price for Cardizem CD is greater than the price for its generic alternatives. In support, Plaintiffs proffer generalized evidence showing that: (1) the average wholesale price or published list price for Cardizem CD and its AB-rated generic bioequivalents is the base price from which all other prices are determined or negotiated (i.e., discounts, rebates, reimbursements, etc.); (2) the list price for Cardizem CD is greater than the list price of its generic versions at the manufacturer level as well as the retail level of distribution; and (3) the price differential between Cardizem CD and Cartia XT at the retail level confirms

---

8. *See e.g.,* Dr. Saha 8/1/00 Rebuttal Report and Ex. 4A–4C. *See also* Plfs. Ex. C from 2/8/01 Hrg., Drugstore.com, Cardizem CD and generic bioequivalent price quotations for consumers (showing substantial price savings for generic version of Cardizem CD).

that lower prices for generics at the manufacturing level predictably translate into lower prices for end-payers at the retail level.[9]

Indeed, Plaintiffs assert, the generic drug industry would not exist if retail prices for generics were not lower than brand name drug prices. As one court observed, the brand name drug manufacturer's efforts to keep the generic off the market "emanates from the fact that the introduction of the generic product would force down the price paid" for the drug. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3rd Cir.2000). Likewise, Defendants' anticompetitive conduct here emanates from the fact that introduction of Andrx's generic version of Cardizem CD at a lower price would predictably erode HMRI (the brand manufacturer)'s market share, cut into its profits, and force down the price consumers pay for the drug should they choose its generic version.

Defendants' attempt to characterize the market as too complex for common proof of injury is not unique.

The heart of defendants' argument is that the individual questions of fact and law predominate over the general questions of law and fact because the price paid by each [class member] was determined through an elaborate system of individualized negotiations, contract and rebates. To determine any classwide impact, argue the defendants, you must first prove the impact, if any, on each of the class members. Because pricing in the industry is allegedly so individualized, the plaintiffs will be unable to show any consistent classwide relationship between the acts of the defendants and the prices paid by class members. Or at the very least, argue the defendants, proving such impact will re-

quire infinite mini-trials concerning the price actually paid by each class member. *In re Commercial Tissue Products*, 183 F.R.D. 589, 595 (N.D.Fla.1998). The courts have routinely rejected similar arguments, despite differences in prices paid by class members, where the plaintiffs show that the "minimum baseline for beginning negotiations, or the range of prices which resulted from negotiations, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." *Id.* (citing *In re Catfish Antitrust Litigation*, 826 F.Supp. 1019 (N.D.Miss.1993)). *See also In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 523; and *Hedges Enter., Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D.Pa. 1979).

In *In re NASDAQ Market–Makers Antitrust Litig.*, the court observed that "[n]either a variety of prices nor negotiated prices is an impediment to class certification *if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally.*" 169 F.R.D. at 523 (emphasis added). The *NASDAQ* Court quoted with approval the holding in *Hedges Enterprises, Inc. v. Continental Group, Inc.*, 81 F.R.D. at 475:

> The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary . . . . [T]he proof with respect to the "base" price from which these negotiations began, or the

---

9. *See e.g.,* Dr. Saha Rebuttal Report and Ex. 4A–4C (concluding that price savings at the manufacturer level are passed on to the retail level and translate into savings to end-payers based on his use of widely-accepted economic methodology and existing data); Dr. Saha 11/3/00 Sur–Rebuttal Report at 5–7; 2/8/01 Hrg. Tr. at 47–50 (Dr. Saha's testimony that additional analysis on a store-by-store basis of the two most commonly prescribed doses of Cardizem CD and its generic alternatives revealed that the brand price was

greater than the generic price 96% and 98% of the time respectively); 2/8/01 Hrg. Tr. at 89–91 (Defendants' expert Dr. Snyder's testimony that the first generic manufacturer to enter the market looks to the brand-name drug's list price and sets the generic's list price at the point of entry at about 60% to 70% of the brand-name manufacturer's list price and that the second and third generics enter the market at an even lower list price than the brand).

structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly ... the fact of damage is predominantly, if not entirely, a common question.

*In re NASDAQ*, 169 F.R.D. at 523. *Accord In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y.1996) (observing that "[t]he theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury"); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 689; *Midwestern Mach. v. Northwest Airlines, Inc.*, No. 97–1438, slip op. at 6–9, 16–19 (D.Minn. Jan.18, 2001) (certifying a class of consumers alleging that Northwest's illegal anticompetitive conduct caused them injury by overcharging them for their airline tickets after finding that Plaintiffs satisfied the predominance requirement by proffering generalized evidence that all air fare prices were determined or negotiated from a published base price).

The arguments that Defendants present here, that diversity in the ultimate price each class member paid for Cardizem CD and Cartia XT destroys predominance, are similarly unavailing. The cases from the Eastern District of Michigan that Defendants' rely upon do not discuss the artificially inflated base price argument that Plaintiffs advance here. *See Am. Custom Homes, Inc. v. Detroit Lumberman's Ass'n*, 91 F.R.D. 548 (E.D.Mich.1981) and *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, No. 91–CV–76072–DT, 1993 WL 527928 (E.D.Mich. Oct.19, 1993). To the extent the unpublished Michigan trial court decisions Defendants' rely upon reach a contrary re-

sult, this Court finds them unpersuasive. This Court is not convinced that the language of the Michigan Antitrust Reform Act requires any greater proof of injury than do § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and § 4 of the Clayton Act, 15 U.S.C. § 15 (which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee").[10]

That Plaintiffs may be unable to establish injury as to a few class members will not defeat class certification where they show widespread injury to the class. *See In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 493 (observing that "[t]he fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing [generalized damage] as to all"). *Accord In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. at 618 (observing that "at the class certification stage, Plaintiffs must show that antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs need not show antitrust impact in fact occurred on a classwide basis."). As the court clarified in *In re Auction Houses Antitrust Litig.*, 193 F.R.D. at 167:

The Court cannot exclude the possibility that there will be some individualized questions pertaining to impact. It perhaps even is likely that the prices paid by some class members will have to be compared to a construct of the prices that would have prevailed absent the alleged conspiracy in order to determine whether they in fact were injured by it. But the Court is persuaded, at least on the present record, that

---

10. The Michigan Antitrust Reform Act, Mich. Comp. Laws Annot. § 445.778(2) provides that: "Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for ... actual damages sustained by reason of a violation of this act, and,

as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act."

the impact question is quite predominantly a common question.

193 F.R.D. at 167. The same reasoning and result apply here.

Moreover, the fact that Defendants' expert disagrees with Plaintiffs' expert's analysis and conclusions concerning common impact is neither surprising nor relevant at this stage of the litigation. *See In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042 (observing that "[w]hether or not plaintiffs' expert is correct in his assessment of common impact/injury is for the trier of fact to decide, at the proper time."). At the class certification stage, the Court, "without trenching on the merits," must "consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature that ... the class action will provide a tremendous savings of time and effort." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697 (internal quotes and citations omitted).

### (iii) Variations in Health Insurance Coverage

■ Defendants further argue that differences in consumer class members' health benefit plans will affect whether and to what extent each class member was injured. With the exception of consumers with health care benefits that allow them to pay the same fixed price for either brand-name or generic prescription drugs, the differences Defendants highlight affect the quantum of damages; not the fact of injury. Consumers whose out-of-pocket expenditures do not vary with the cost of their prescription drugs cannot show that they suffered an economic injury as a result of Defendants' illegal conduct. Plaintiffs' proffered generalized evidence does not show otherwise. Therefore, the Court redefines the class to exclude these individuals. As redefined, Plaintiffs allegations and proffered generalized evidence posit "class-wide injury resulting from every single member's overpaying" for their prescription drug purchases as a result of Defendants' illegal conduct. *See In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. at 82.

### (C) Mitigation and Pass–On Defenses

■ Defendants also argue that Plaintiffs' injury analysis must consider whether third-party payer class members failed to mitigate their damages or passed-on any overcharges they may have incurred as a result of Defendants illegal conduct. Despite Defendants' claims to the contrary, "the presence of individualized defenses, such as mitigation, going only to damages are generally regarded as no barrier to class certification." *In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D. at 86. "[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

Without citation to a Michigan decision that permits the defensive use of pass-on theories, Defendants contend that its use is fair game under state indirect purchaser statutes although it is precluded in federal direct purchaser cases. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). This argument presents a merit-based question of law that the Michigan courts have apparently not yet addressed, and it would be premature for this Court to address it at this stage of the litigation. *See B.W.I. Custom Kitchen*, 191 Cal.App.3d at 1352, 235 Cal.Rptr. at 236 (observing that resolution of this issue of first impression would be premature at the class certification stage of litigation).

In light of the above, this Court finds that the proposed class, as redefined, is susceptible to class-wide proof of impact. This does not end the Court's predominance inquiry. The Court now evaluates whether Plaintiffs have satisfied their burden of showing "that the computation of damages is susceptible to common proof." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 692.

### b. Class–Wide Damages Can be Proven in the Aggregate

Defendants complain that Plaintiffs' expert's opinions rely upon average wholesale and retail prices and "yardstick" and "before-

and-after" methodologies that fail to account for the important differences Defendants highlight. Defendants further complain that an assessment of the class members' aggregate damages using average prices will result in an improper "fluid recovery" and will thus violate their due process rights. Defendants' arguments are not persuasive.

### (1) Plaintiffs' Burden at Class Certification

■ "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697. "This relaxed standard flows from the equitable notion that the wrongdoer should not be able to profit by insistence on an unattainable standard of proof." *Id.* (citing *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042–43). "Obviously, certain knowledge of what plaintiff's position would have been in the absence of defendant's antitrust violation is never known." *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042 (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981)). "Moreover, the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

### (2) Plaintiffs' Burden Is Satisfied; Plaintiffs Have Proffered Reasonable Damage Methodologies That Are Common to the Class

■ Plaintiffs have proffered reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members. The economic methods Plaintiffs propose are widely accepted. *See In re NASDAQ*, 169 F.R.D. at 521 (citing ABA Antitrust Section, Antitrust Law Developments (3d ed.1992) at 669–673, and cases cited therein). Furthermore, the methodologies are common to the class, and their validity "will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." *Id.*

Plaintiffs' expert, Dr. Saha, proposes application of the "yardstick" and "before-and-after" approach to available industry data to assess class damages on an aggregate basis. He also proposes a simple model for calculating the aggregate damage estimate. *See* Dr. Saha 8/1/00 Rebuttal Report, Appendix. To apply the model, he would determine: (1) the expected generic penetration rate but-for Defendants' illegal conduct; (2) the expected price for Cardizem CD; and (3) the expected price differential between Cardizem CD and it's A–B rated generics during the class period. Dr. Saha concludes that each of these three inputs can be readily determined using available data and applying the before-and-after and yardstick approaches. *See id.* at 11.

As to the generic penetration rate, Dr. Saha opines that he can, with reasonable accuracy, estimate the percentages of class members that would have switched to generic drugs at various points in time throughout the class period if generic entry had not been delayed. Using the before-and-after approach, he will examine the switching experience that actually occurred after Cartia XT's generic entrance into the market in July 1999, will make the appropriate adjustments for the critical differences in the actual and but-for worlds, and will estimate the generic penetration rate at various points in time in the but-for world. He concludes that, if required, the differences that Defendants' expert highlights can be accounted for and appropriate adjustments can easily be incorporated into the before-and-after methodology using regression analyses. *See* Dr. Saha 11/3/00 Sur–Rebuttal Report at 4.

Dr. Saha further opines that he can, with reasonable accuracy, estimate the market share that generic versions of Cardizem CD will likely capture in the future. His proposed methodology uses the "yardstick" ap-

proach and compares the market share erosion of Cardizem CD with that of 28 other brand-name drugs that faced generic competition in the 1990's. *See* Dr. Saha 8/1/00 Rebuttal Report at 6. He concludes that, because the pattern of Cardizem CD's post-generic entry market share erosion is remarkably consistent with the average pattern of these 28 other brand-name drugs, the average pattern itself is an appropriate yardstick. *See* Dr. Saha 11/3/00 Sur-rebuttal Report at 3. Dr. Saha finds support for his proposed methodology in numerous government and academic studies and scientific articles, and he is confident that sufficient data is readily available to reliably forecast the generic penetration rate here.

To estimate the price differential of the "but-for" and actual prices paid by end-payers, Dr. Saha proposes use of both the yardstick and before-and-after approaches and the detailed pharmaceutical data that is readily available. He concludes that both approaches can suitably account for differences in market conditions and other factors that may have prevailed in the "but-for" world. Where necessary, Dr. Saha opines, he can accurately account for the individual differences Defendants highlight when apportioning the aggregate damage amount among class members. Such apportionment will be possible here using computerized rec-

ords of the relevant drug purchases, the proposed damage methodology and formula, and detailed claims forms.

Defendants have prepared numerous forecasts and models of the expected rate of generic penetration using the same methods Plaintiffs propose here.[11] Before entering into the September 1997 HMRI/Andrx Agreement, HMRI used a similar yardstick method to make its own projections of the effects of generic entry and to reach agreement on the amount HMRI would pay Andrx to compensate Andrx for its "lost profits." [12] In March 1998, Andrx used a similar yardstick method to project the market share and revenues it would receive after generic entry.[13] Defendants' use of these methods refutes their current criticism that they are too unreliable to provide accurate results.

Defendants' complaints that Plaintiffs' methodology and its damage calculations are too imprecise for class certification are to no avail. At the class certification stage, it is not necessary to identify specific benchmarks or methodology to ascertain the amount of damages. "It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility" to deal with the individual damages issues that may develop.[14] *See In re NASDAQ Market–Makers Antitrust Litig.*,

---

**11.** *See, e.g.,* Plfs. Reply Ex. P, 7/28/00 HRMI Press Release (noting a 62.8% decline in Cardizem CD sales "which had been expected due to the onset of generic competition in the U.S."); Plfs. Reply Ex. Q, 7/20/00 Press Release (predicting future Cardizem CD losses due to generic competition); Plfs. Reply Ex. S, FTC Dep. Testimony of HMRI's Kelly Blinzler (forecasting generic penetration rate); Plfs. Ex. A from 2/8/00 Hrg., 6/16/00 Testimony of Frank Ciriello, Cardizem CD Product Manager, in action pending in the United States District Court for New Jersey, *Biovail Corp. Int'l v. Hoechst AG, et al,* Civ. No. 98–1434 (explaining how HMRI forecast the effects of generic entry on Cardizem CD's market share, testifying that in hindsight the forecast was a pretty accurate description of what actually occurred once generic competition entered the market, and testifying that all generic penetration curves reach 90% of the market share and the greater the number of generics on the market the quicker that 90% mark is achieved); Plfs. Ex. B from 2/8/00 Hrg., Wilkerson Group 12/31/97 Report (forecasting the effects of generic competition to Cardizem CD including generic penetration rates and the impact on Cardizem

CD sales under a number of generic entry scenarios).

**12.** *See e.g.,* Plfs. Reply Ex. U, Dep. Testimony of HMRI counsel Edward Stratemeier (explaining how the Andrx "lost profit" figure was negotiated in the HMRI/Andrx Agreement).

**13.** *See e.g.,* Plfs. Reply Ex. V, FTC Dep. Testimony of Andrx's Karen Rice (forecasting the market share Andrx's generic would capture from Cardizem CD).

**14.** Fed.R.Civ.P. 23(c)(1) provides that an order under Rule 23 "may be conditional, and may be altered or amended before the decision on the merits."

Fed.R.Civ.P. 23(d) provides that: "In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; ...."

169 F.R.D. at 522. "The Court need not decide at this juncture what approach is best suited to the particularities of this case." *Id.*

Defendants argue that Plaintiffs' expert's inability to answer questions about the specifics of his proposed methodology render his opinion nothing more than unexplained assurances that he can compute damages on a class-wide basis. The courts have routinely rejected similar arguments. *See In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 692–93 (citing *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 1989–2 Trade Cas. (CCH) ¶ 68,818 at 62,284 (D.Minn.1989); *In re Corrugated Container Antitrust Litig.,* 556 F.Supp. 1117, 1154 (S.D.Tex.1982); *In re Plywood Antitrust Litig.,* 1979–1 Trade Cas. (CCH) ¶ 62,459 (E.D.La.1978), *aff'd,* 655 F.2d 627 (5th Cir. 1981)). "It is not necessary that plaintiffs show that [their expert]'s methods will work with certainty at this time. Rather, plaintiffs' burden is to present the Court with a likely method for determining class damages." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 693. Plaintiffs have met that burden here. *See Lumco Indus., Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 174 (E.D.Pa.1997) (observing that "[a]t this point, . . . Plaintiffs are not required to come forward with more specific formulas for calculating damages.").

Despite Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide damages is appropriate. As observed by a leading commentator on class actions: "[a]ggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis." 2 *Newberg on Class Actions,* Chapter 10, § 10.05 at 10–8 (3d ed.1992) (footnote omitted). "Far from being vulnerable to constitutional or statutory authorization challenges, aggregate proof of the defendant's monetary liability promotes the deterrence objectives of the substantive laws underlying the class actions and promotes the economy and judicial access for small claims objectives of Rule 23." *Id.* at 10–13.

Defendants' additional arguments, that Dr. Saha's methodology makes improper use of averages and results in a fluid recovery, are likewise unavailing. "The fact that the methodologies contain some form of averaging does not automatically render them methods of fluid recovery." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 691. Moreover, "[d]amages in an antitrust class action may be determined on a classwide, or aggregate, basis, without resorting to fluid recovery where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *In re NASDAQ,* 169 F.R.D. at 526. Here, Plaintiffs' expert opines, computerized records of relevant drug purchases are available to be used along with the proposed damage methodology, formulaic calculation, and detailed claims forms as a means to distribute to injured class members an amount reflecting their actual damages. *See* Saha 6/15/00 Initial Report; 8/1/00 Rebuttal Report and 11/3/00 Sur–Rebuttal Report.

The bulk of Defendants' arguments challenge the merits of Dr. Saha's conclusions. The courts routinely reject such arguments, observing that they are improper at this stage of the litigation. "[T]he fact that the defendants' expert disagrees with the methodology and conclusions propounded by [plaintiff's expert] is not reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury . . . remains to be seen." *In re NASDAQ,* 169 F.R.D. at 522 (internal quotes and citation omitted). "It is particularly important at this point to focus on the task before the court in considering a motion for class certification. The court is not to consider the merits of the claim; . . . . Instead, the court is only to consider whether the type of proof offered by plaintiffs . . . will be of classwide character such that class action treatment of the case will be superior to myriad individual actions." *In re Commercial Tissue Products,* 183 F.R.D. at 596. The relevant inquiry here is whether generalized evidence exists which will prove or disprove Plaintiffs' claims on a simultaneous, class-wide basis.

*See In re Potash Antitrust Litigation,* 159 F.R.D. at 693. That standard is met here.

For the above reasons, this Court finds that common questions predominate over individual ones in the proof of Plaintiffs' claimed injuries and damages. The Court now addresses Plaintiffs' final requirement for class certification: satisfaction of Rule 23(b)(3)'s superiority requirement.

### 2. Superiority

 Fed.R.Civ.P. 23(b)(3) also requires the Court to find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [15] The superiority requirement is fulfilled here. Multiple lawsuits by the large number of class members allegedly injured by Defendants' antitrust violations would be costly and inefficient. *See In re NASDAQ,* 169 F.R.D. at 527.

As to the consumer class members, the courts have observed that the class action device is appropriate where there is a large number of potential plaintiffs but no one particular person has suffered damages large enough to induce him to bring suit alone. *See id.* "[T]he exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims." *Id.* As to the third-party payer class members and Defendants' assertion that their large size renders their claims inappropriate for class treatment, the Sixth Circuit has observed that "[t]he procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather to achieve the economies of time, effort, and expense." *Sterling v. Velsicol Chem. Corp.,* 855 F.2d at 1196 (citations omitted). The economies of time, effort and expense will be achieved by certifying a class in this action because the same illegal anticompetitive conduct by Defendants gives rise to each class member's economic injury.

*See In re Synthroid Marketing Litig.,* 188 F.R.D. at 295–96 (rejecting defense argument that "a class action is not a superior method of litigation because the potential class members are sophisticated insurance companies with substantial financial incentive to sue individually").

Defendants' manageability arguments assume that individual rather than common issues predominate as to injury. As discussed above, this assumption is false. Defendants' argument that individual damage questions preclude class certification is likewise to no avail. "[I]f individual damage questions were a barrier to class certification, there would be little if any place for the class action device in the adjudication of antitrust claims." *In re NASDAQ,* 169 F.R.D. at 524 (internal quotes and citation omitted). Plaintiffs' contend that detailed data is readily available to ascertain individual damage amounts. Moreover, if complications in calculating damages appear evident, the Court has the option, under Rule 23(c)(1), to alter or amend its class certification order before a decision is rendered on the merits. *See* Fed. R.Civ.P. 23(c)(1). It also has the option of bifurcating the liability and damage phases of the litigation or appointing a special master or magistrate judge to assist in calculating damages. *See Little Caesar Enter.,* 172 F.R.D. at 267. Accordingly, the Court finds that a class action is superior to other methods for fairly and efficiently adjudicating this controversy.

Finally, the Court addresses Defendants' argument that Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement as to their claims of unjust enrichment.

### C. Plaintiffs' Unjust Enrichment Claim and Rule 23(b)(3)

 As the Michigan courts have observed, "[a] person who has been unjustly enriched at the expense of another is re-

---

**15.** Factors to be considered include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(C) the desirability or undesirability of concentrating litigation of the claims in the particular forum;
(D) the difficulties likely to be encountered in the management of a class action.
Fed.R.Civ.P. 23(b)(3).

**352**

quired to make restitution to the other." *B & M Die Co. v. Ford Motor Co.*, 167 Mich. App. 176, 421 N.W.2d 620, 622 (1988). Here, it is alleged that Defendant Andrx was unjustly enriched at the expense of the Plaintiff class when it received tens of millions of dollars under the illegal HMRI/Andrx Agreement. *See* Complt., Michigan Prayer for Relief Section E, Fourth Claim for Relief, ¶ (xx).

Defendants assert that Plaintiffs' unjust enrichment claims are not appropriate for class treatment because individual issues concerning liability and damages predominate over common issues.[16] If a particular class member was not overcharged, Defendants argue, then there is no injury; and if there is no injury, there can be no unjust enrichment. Defendants' arguments are not persuasive because they misapprehend the nature of Plaintiffs' unjust enrichment claim. This Court has previously recognized that the nature of Plaintiffs' restitution claim for unjust enrichment and disgorgement is undivided and integrated, and "the disgorgement remedy would inure to the benefit of the class rather than vindicate any alleged violations of individual rights." *In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d 819, 825–26 (E.D.Mich.1999) (internal quotes and citations omitted). Plaintiffs' success or failure in proving this unjust enrichment claim will mean success or failure for the class as a whole; not individual class members.

Plaintiffs' allegations of disgorgement against Andrx do "not depend, rely upon, or arise out of the vindication of individual rights of the putative class members. In the words of the complaint, disgorgement is appropriate because '[i]t would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst–Andrx Agreement'." *In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d at 826 (internal quotes and citations omitted). "[P]ursuant to the allegations in Plaintiff's complaint, (1) Plaintiff is seeking, on behalf of the putative class as a whole, to disgorge the tens of millions of dollars paid to Andrx in connection with the

Hoechst–Andrx Agreement on the ground that it was unjustly enriched by such payment; (2) this claim is in addition to and separate from individual claims for compensation for overpayments to Defendant Hoechst; (3) the disgorgement remedy would inure to the benefit of the class rather than vindicate any alleged violations of individual rights, ...; and (4)[i]f any given plaintiff does not collect his, her, or its share, then it does not change the amount of profits of which defendants must be disgorged. Thus, according to the complaint, the plaintiff class has a collective right to a disgorgement in the amount of the unjust enrichment, and that amount does not depend upon the number of plaintiffs. Plaintiff, as alleged in the complaint, seeks to compel Andrx to pay to the Class the full amount it has received in connection with the Hoechst–Andrx Agreement, regardless of the actual damages proved by each plaintiff and regardless of the number of plaintiffs in the purported class. The possible recovery on this claim is either all or nothing." *Id.* (internal quotes and citations omitted). Accordingly, this Court finds that common questions predominate over individual ones as to Michigan Plaintiffs' undivided and integrated unjust enrichment claim.

## IV. Conclusion

The Court finds that all of the requirements of Rules 23(a) and 23(b)(3) are satisfied and determines that this action shall be maintained as a class action on behalf of the class as redefined herein. Accordingly, State Law Plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**. This determination is conditional and may be altered or amended prior to the decision on the merits in light of any changes in circumstances that make such action advisable. *See* Fed.R.Civ.P. 23(c)(1).

---

16. Defendants do not challenge Plaintiffs ability to satisfy the remaining Rule 23 prerequisites with regard to their unjust enrichment claim.