[No. D043543. Fourth Dist., Div. One. July 21, 2004.]

In re CIPRO CASES I and II

**[Nine coordinated cases.*]**

*McGaughey v. Bayer Corporation* (Super. Ct. San Diego County, No. GIC752290); *Relles v. Bayer Corporation* (Super. Ct. L.A. County, No. BC239083); *Samole v. Bayer AG* (Super. Ct. S.F. City and County, No. 316349); *Garber v. Bayer AG* (Super. Ct. S.F. City and County, No. 316518); *Lee v. Bayer AG* (Super. Ct. S.F. City and County, No. 316670); *Patane v. Bayer AG* (Super. Ct. S.F. City and County, No. 318457); *Moore v. Bayer Corporation* (Super. Ct. Sonoma County, No. SCZ228356); *Moore v. Bayer Corporation* (Super. Ct. Sonoma County, No. 228384); *Senior Action Network v. Bayer AG* (Super. Ct. S.F. City and County, No. 400750).

**COUNSEL**

Luce, Forward, Hamilton & Scripps, Christopher J. Healey, Richard Spirra, Todd R. Kinnear; Jones Day, Phillip A. Proger, William V. O'Reilly, Craig E. Stewart; Bartlit, Beck, Herman, Palenchar & Scott, Philip S. Beck, Fred H. Bartlit, Jr., and Michael J. Valaik for Petitioner Bayer Corporation.

Edelson & Rezzo and Joann F. Rezzo for Petitioners Barr Laboratories, Inc., The Rugby Group, Inc., Watson Pharmaceuticals, Inc., and Hoechst Marion Roussel, Inc.

Kirland & Ellis, Karen N. Walker and Edwin John U for Petitioner Barr Laboratories, Inc.

Stinson, Morrison, Hecker, David E. Everson, Jr., Kay G. Noonan and Heather S. Woodson for Petitioners Hoechst Marion Roussel, Inc., and The Rugby Group, Inc.

No appearance for Respondent.

Lieff, Cabraser, Heimann & Bernstein, Joseph R. Saveri, Eric B. Fastiff; Zwerling, Schachter & Zwerling, Dan Drachler; Krause & Kalfayan, James C. Krause, Ralph B. Kalfayan and Agustin F. Lopez II for Real Parties in Interest.

**OPINION**

**AARON, J.**—Petitioners Bayer Corporation, Barr Laboratories, Inc., The Rugby Group, Inc., Watson Pharmaceutics, Inc., and Hoechst Marion Roussel, Inc., seek a writ of mandate directing the superior court to vacate its order granting class certification in a coordinated proceeding against them for alleged violations of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.), the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), and the common law. We conclude that the trial court did not abuse its discretion in certifying the class. We nevertheless grant relief because the class as defined by the trial court is overbroad to the extent it includes purchasers of Cipro who paid a flat copayment when they would have paid for a generic substitute under their health insurance.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Allegations of Class Action Complaint*

This matter arises out of a series of cases filed in various counties in California, which have been coordinated in the Superior Court of San Diego County pursuant to Code of Civil Procedure section 404 et seq. The following facts are taken from the consolidated second amended complaint filed in the coordinated proceeding.

Cipro is the brand name for ciprofloxacin hydrochloride (ciprofloxacin), an antibiotic prescribed for the treatment of various infections. Cipro is manufactured and marketed by Bayer AG and its subsidiary Bayer Corporation (collectively referred to as Bayer). In 1987, Bayer obtained a patent on ciprofloxacin known as the "444 patent." Cipro is the best selling antibiotic in the world. Cipro was the first Bayer product to post over $1 billion in annual sales in the United States.

In 1991, Barr Laboratories, Inc. (Barr) applied for approval from the federal Food and Drug Administration (FDA) to market a generic version of Cipro. As authorized by the federal Hatch-Waxman Act (21 U.S.C. § 355), Barr challenged the validity of Bayer's 444 patent. In January 1992, Bayer brought a patent infringement suit against Barr in federal court, which triggered a 30-month waiting period for FDA approval of Barr's application under the Hatch-Waxman Act. In its answer to Bayer's complaint, Barr asserted that the 444 patent was invalid and unenforceable.

According to the complaint, Bayer's internal studies estimated that a generic version of Cipro could capture 70 percent of the market within

the first six months of marketing and 90 percent within the first full year of generic competition. Based on Barr's predictions, Bayer stood to lose at least $750 million in annual revenues within a few years after the introduction of generic competition.

Bayer settled the patent litigation in January 1997 and entered into several interrelated agreements (the Cipro Agreements) with Barr and two other entities affiliated with Barr-Hoechst Marion Roussel, Inc. (HMR) and The Rugby Group, Inc. (Rugby). Under the terms of these agreements, Barr acknowledged the validity of the 444 patent. Barr, HMR, and Rugby agreed to refrain from selling or marketing a generic version of Cipro. In exchange, Bayer paid Barr and HMR a lump sum of $49.1 million and agreed that it would either license and supply Cipro to Barr and HMR for resale, or make additional quarterly payments to Barr and HMR. As of the filing of the complaint, Bayer had opted to pay a total of $398 million in quarterly payments to Barr and HMR.

The complaint alleges that, in the absence of the Cipro Agreements, Barr would have begun manufacturing, marketing, and selling generic ciprofloxacin in the United States market no later than January 1997. According to the complaint, the purpose of the Cipro Agreements was to allocate the entire United States market for ciprofloxacin to Bayer for at least six years, to restrain competition in the market, and to grant Bayer an unlawful monopoly with the concomitant ability to charge supracompetitive prices for Cipro.

The complaint alleges causes of action for per se violation of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.), unfair competition in violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), and the common law tort of monopolization.

The named plaintiffs are individual residents and not-for-profit entities in California, each of whom allegedly purchased Cipro indirectly from Bayer. The complaint alleges that the named plaintiffs are suing on behalf of themselves and a class of California individuals and entities "who indirectly purchased, paid and/or reimbursed for Cipro intended for consumption by themselves, their families, or their members, participants, employees or insureds (the 'Class') during the period from January 8, 1997 through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, have ceased (the 'Class Period')." According to the complaint, the named plaintiffs and the class members paid substantially more for Cipro than they would have had to pay in a competitive market.

B. *Class Certification Motion*

In December 2002, plaintiffs filed a motion for certification of the class described in the complaint. The motion was supported by a declaration

of economist Raymond S. Hartman, as well as declarations of the named plaintiffs. According to Hartman, he had "analyzed whether the indirect end-payer purchasers of Cipro in California were impacted as a Class and damaged economically as a result of the alleged antitrust violations and other unlawful conduct among Defendants." Based on his economic analysis, Hartman concluded that the purchasers of Cipro had been damaged economically, for two reasons: "First, all scientific evidence indicates that over time consumers switch in large numbers from a branded drug to its lower-priced bioequivalent generic once that generic becomes available. Second, existing evidence suggests that branded prices would have been lower once the generic entered."

Hartman also analyzed "whether class-wide analysis is feasible and is the most efficient and effective way of analyzing impact and measuring damages." He concluded that it was. According to Hartman, there exists a "standard formulaic methodology" to calculate both the amount of overcharges to the class as a whole and the monetary remedies available under Business and Professions Code section 17200. Hartman described the formula in detail in his declaration and explained that the formula was widely used and accepted in scientific analysis of the penetration of generic drugs into the market.

Defendants opposed the motion for class certification and submitted evidence in opposition to the Hartman declaration, including expert declarations from economists Gregory K. Bell and James Hughes. The defense experts asserted that there was no method for determining the impact on the class or for measuring damages to its individual members through common proof. In the opinions of the defense experts, the individual circumstances of the putative class members were too varied to permit an assessment of their claims on a classwide basis.

Hartman submitted a rebuttal declaration in opposition to the defense experts. In his rebuttal declaration, Hartman reaffirmed the opinions set forth in his initial declaration, and explained why he believed Bell's and Hughes's objections to class certification were invalid.

## C. *The Trial Court's Ruling*

After issuing a tentative ruling and hearing oral argument, the trial court entered a written order granting the motion for class certification. The court found that the proposed class was an easily ascertainable group of "hundreds of thousands" of individuals and entities who had purchased Cipro. The court further concluded that there was a community of interest among the class members because there was a predominance of common issues, the claims of

the class representatives were typical of the class as a whole, and the class representatives could adequately represent the class. Finally, the court found that a class action was the most efficient and fair means for adjudication of the claims.

### D. *Writ Proceedings*

On January 9, 2004, Bayer, Rugby, HMR, and Watson filed a petition for writ of mandate or other appropriate relief seeking review of the class certification order. We issued an order to show cause.

## II

## DISCUSSION

### A. *Appellate Review of Class Certification Orders*

An order certifying a class is not appealable except on appeal from the final judgment. (See *Shelley v. City of Los Angeles* (1995) 36 Cal.App.4th 692, 695–696 [42 Cal.Rptr.2d 529]; Code Civ. Proc., § 904.1.) However, such an interlocutory order is reviewable by way of a petition for writ of mandate. (*Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 387, fn. 4 [134 Cal.Rptr. 393, 556 P.2d 755].)

A trial court's order granting or denying class certification is subject to review for abuse of discretion. (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 959 [46 Cal.Rptr.2d 266].) "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).) However, the trial court's ruling must be reversed if its findings are not supported by substantial evidence, if improper criteria were used, or if erroneous legal assumptions were made. (*Id.* at pp. 435–436, citing *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; see also *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106 [131 Cal.Rptr.2d 1, 63 P.3d 913] (*Lockheed*).)

### B. *The Trial Court Did Not Abuse Its Discretion in Certifying a Class*

Code of Civil Procedure section 382 authorizes class actions when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." "To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among

the class members." (*Linder, supra,* 23 Cal.4th at p. 435.) To establish a community of interest, three factors must be shown: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.)

Petitioners do not contest the trial court's findings as to the existence of an ascertainable class, the typicality of the class representatives' claims, or the adequacy of representation by the class representatives. Rather, they focus exclusively on the trial court's finding that there are predominant common questions of law or fact. Specifically, petitioners contend that there are numerous individual issues pertaining to liability and to damages that preclude class certification, and that the trial court erred in ruling that injury to all class members may be assumed where a horizontal market-wide restraint of trade is alleged. We reject these contentions.

### 1. *There Are Substantial Questions of Law and Fact Common to All Class Members*

The predominance factor requires a showing "that questions of law or fact common to the class predominate over the questions affecting the individual members." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913 [103 Cal.Rptr.2d 320, 15 P.3d 1071].) "The ultimate question in every case of this type is whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants." (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238 [102 Cal.Rptr. 1, 497 P.2d 225].) The trial court must "carefully weigh respective benefits and burdens and . . . allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 459 [115 Cal.Rptr. 797, 525 P.2d 701].)

The trial court here properly concluded that there are substantial issues of law and fact common to all of the proposed class members. Determining whether the Cipro Agreements violate the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.), the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), or the common law requires the resolution of potentially complex issues that do not vary among the individual class members. The nature and circumstances of the Cipro Agreements—and their legality under California law—raise identical factual and legal issues as to every member of the class. For every single class member to litigate these common issues separately would impose a substantial burden on the courts and the litigants.

State and federal courts alike have recognized that common issues usually predominate in cases where the defendants are alleged to have engaged in collusive, anticompetitive conduct resulting in artificially high market-wide prices for a product. In such cases, the existence of the conspiracy and its legality generally present common questions of law and fact that predominate over any questions affecting only individual class members. (See, e.g., *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1348–1349 [235 Cal.Rptr. 228] (*B.W.I.*), citing cases; *Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 751–763 [182 Cal.Rptr. 800] (*Rosack*); *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla. 2004) 220 F.R.D. 672, 684–686 (*Terazosin*); *In re Lorazepam & Clorazepate Antitrust Litigation* (D.D.C. 2001) 202 F.R.D. 12, 26–27 (*Lorazepam*); see also Wright, Miller & Kane, 7B Fed. Practice and Procedure (2d ed. 1986), § 1781, p. 8.)

In *Terazosin*, the district court recently concluded that common issues predominated in a case factually similar to ours. *Terazosin* was an antitrust class action brought against a brand-name drug manufacturer and its generic competitors, arising out of an allegedly anticompetitive settlement of patent litigation, which the plaintiffs claimed had the effect of delaying entry of a generic product and causing artificially inflated prices for the drug. The district court concluded that there were common questions of law and fact applicable to all class members, and that these common questions predominated over individual issues. (*Terazosin, supra*, 220 F.R.D. at pp. 685–686, 694–699.)

There is also substantial evidence in the record to support the trial court's finding that the impact of the Cipro Agreements on the class as a whole is subject to common proof at trial. The damages suffered by the class depends primarily on the effect of Bayer's alleged monopoly on the overall market for ciprofloxacin. This is a matter that is subject to classwide proof by way of expert testimony, without regard to the particular circumstances of each individual class member. As the trial court noted in its ruling, economist Raymond S. Hartman offered his expert opinion that the total amount of overcharges to the class as a whole could be calculated based on a standard economic formula described in his declarations.

The use of such a formula is an accepted method of proving aggregate damages to the class. (3 Conte & Newberg, Newberg on Class Actions (4th ed. 2002) § 10:3, pp. 479–480.) "In many cases such an aggregate calculation will be far more accurate than summing all individual claims." (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 129, fn. 4 [179 Cal.Rptr. 342].) "The law requires only that some reasonable basis of computation be used,

and the result reached can be a reasonable approximation." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398 [112 Cal.Rptr.2d 99].)

■ Expert opinion constitutes substantial evidence to support a class certification order if it is based on relevant, probative facts, as opposed to mere guesswork, surmise, or conjecture. (See *Lockheed, supra,* 29 Cal.4th at p. 1110.) Hartman's expert opinion was based on existing data sources, published scientific analyses, the history of other comparable generic drugs, Bayer's internal strategic planning documents, Bayer's invoice and accounting data, the economics literature in the field, and a formulaic methodology widely used and accepted in scientific analysis of the market penetration of generic drugs.

We conclude that Hartman's expert testimony was based on relevant, probative facts and constituted substantial evidence to support the trial court's finding that proof of aggregate impact on the class as a whole can be shown by common proof. (Cf. *Terazosin, supra,* 220 F.R.D. at p. 699 [approving Dr. Hartman's methodology for computing classwide damages and finding that it was based on "widely accepted" economic methods that were "common to the class"]; *In re Relafen Antitrust Litigation* (D. Mass. 2003) 218 F.R.D. 337, 343–344 (*Relafen*) [predominance requirement satisfied in part by expert declaration stating that classwide proof could be used to demonstrate the existence of common injuries resulting from overcharges caused by allegedly unlawful conduct delaying entry of competing generic drug]; *In re Cardizem CD Antitrust Litigation* (E.D.Mich. 2001) 200 F.R.D. 326, 348–351 (*Cardizem*) [expert testimony in support of class certification satisfied plaintiffs' burden of showing that there was an accepted methodology for calculating aggregate damages resulting from allegedly unlawful agreement between manufacturers of brand-name drug and generic version].)

■ The fact that petitioners' experts disagreed with Hartman's analysis and conclusions regarding proof of common impact "is neither surprising nor relevant at this stage of the litigation." (*Cardizem, supra,* 200 F.R.D. at p. 347.) Whether or not Hartman is correct in his assessment of common impact or injury will ultimately be decided at trial. The class certification stage is not the proper forum in which to resolve such a dispute between experts. At this stage of the proceedings, "it is not our role, nor the trial court's job, to involve ourselves with the merits of the underlying action or which parties' experts are most qualified." (*Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1084 [16 Cal.Rptr.3d 25].) At the class certification stage, the court must merely consider merely whether the evidence the plaintiffs will offer to establish aggregate damages will be

sufficiently generalized in nature. (*Cardizem, supra,* at p. 347; *Relafen, supra,* 218 F.R.D. at p. 344.) The trial court properly concluded that plaintiffs made such a showing here.

■ We reject petitioners' argument that the trial court misapplied the law in ruling that injury to the class can be established by common proof. Petitioners assert that the trial court erred in finding that injury to the class may be assumed when a horizontal market-wide restraint of trade is alleged. However, this is ordinarily a permissible assumption in cases where consumers have purchased products in an anticompetitive market, even if some consumers did not actually have to pay the overcharge because of their individual circumstances. (*B.W.I., supra,* 191 Cal.App.3d at pp. 1350–1353.) This principle has been applied to markets characterized by individually negotiated prices, varying profit margins, and intense competition, as well as to indirect purchasers who buy the product from middlemen in a largely unaltered form. (*Id.* at pp. 1351–1353.) With the exception of flat copayers (see p. 418, *post*), we see no reason why this commonsense assumption of harm should not apply to the particular facts of this case. (Cf. *Terazosin, supra,* 220 F.R.D. at p. 696 [finding that "a presumption of impact may apply" in similar circumstances].) Further, we note that the trial court here did not merely *assume* the existence of classwide injury. As we have discussed, the trial court relied on the expert testimony of plaintiffs' economist that the class members had in fact been injured as a result of the higher prices, and that classwide damages could be calculated by common proof at trial. Thus, the trial court did not err in finding that injury to the class as a whole could be established by common proof.

### 2. *The Individual Issues Pertaining to the Fact of Injury and Damages Do Not Preclude Class Certification*

Petitioners nevertheless contend that class certification was improper because the varying circumstances of individual purchasers of Cipro raise numerous individual issues pertaining to the fact of injury and the amount of damages. Specifically, petitioners note that the fact and amount of injury sustained by individual class members depends on many variable factors, such as the exact terms of their medical coverage for prescription drugs, the prescribing practices of their physicians, the retail price of Cipro at the time and place of their purchases, whether they would have switched to a generic product if one had been available, whether they would have purchased a competing antibiotic, and whether price changes would have been passed on to or by class members. According to petitioners, the necessity for individual proof on such issues precludes class certification under the reasoning of *Lockheed, supra,* 29 Cal.4th 1096, and this court's decisions in *J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195 [6 Cal.Rptr.3d

214] (*J. P. Morgan*), and *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836 [7 Cal.Rptr.3d 28] (*Global Minerals*).

We disagree. It is settled that "a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages." (*Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 266 [178 Cal.Rptr. 612, 636 P.2d 575].) "[M]ost class actions contemplate individual proof of damages, which necessarily entails the possibility that some class members will fail to prove damages." (*Bell v. Farmers Insurance Exchange* (2004) 115 Cal.App.4th 715, 744 [9 Cal.Rptr.3d 544] (*Bell*), citing *B.W.I., supra,* 191 Cal.App.3d at p. 1354.) "[I]f proof of individual damages were required by all potentially affected parties as a condition of class certification, it would go far toward barring all class actions." (*Bell, supra,* 115 Cal.App.4th at p. 744.)

These basic principles of class certification were not altered by the Supreme Court's decision in *Lockheed, supra,* 29 Cal.4th 1096. In *Lockheed,* the plaintiffs were residents of a geographic area affected by the defendants' alleged contamination of the drinking water. They sued as a class for medical monitoring of their conditions as a result of their alleged exposure to a wide variety of toxic chemicals. Although the Supreme Court found that the plaintiffs had demonstrated some common issues, it concluded that the common issues did not predominate, because the medical monitoring claim required resolution of numerous individual issues relating to causation and damages. Specifically, the court noted that the validity of the claims for future monitoring of each class member's medical condition depended on the varying chemicals each had been exposed to, the specific dosages in their water, and the duration and severity of their exposure. Because medical monitoring claims require an individual assessment of the plaintiff's increased risk of disease, the court concluded that the questions respecting each individual class member's right to recover following any class judgment were too numerous and substantial to permit class certification. (*Lockheed, supra,* 29 Cal.4th at pp. 1106–1111.)

In reaching this conclusion, however, *Lockheed* emphasized that the plaintiffs were not required to demonstrate they could establish *each* of the elements of their claims by common proof in order to certify the class. The court reaffirmed the long-standing rule "that 'the fact that each member of the class must prove his [or her] separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper.' " (*Lockheed, supra,* 29 Cal.4th at p. 1105, quoting *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964].)

Unlike *Lockheed*, this case does not involve claims for which each individual's entitlement to relief will depend predominantly on unique factual issues that vary among all the class members. Here all of the proposed class members paid for exactly the same prescription drug, all assert that they paid an inflated price for the product, and all assert that they were harmed by the same anticompetitive conduct allegedly committed by defendants. Plaintiffs have presented expert testimony that the price of the product was artificially high because of defendants' allegedly unlawful conduct, and "that overcharges were common to members of the Class who would have switched to generic ciprofloxacin and probable for many members of the Class who would have remained loyal to Cipro." As we have discussed, such claims of anticompetitive collusion resulting in higher market prices are particularly suitable for class treatment.

Our conclusion is consistent with this court's decisions in *Global Minerals* and *J. P. Morgan*. In those companion cases, the plaintiffs were purchasers of copper products who alleged that the defendants had manipulated the price of copper on the London Metal Exchange, causing an artificial inflation of prices on the American copper futures exchange (COMEX), which in turn allegedly caused an artificial inflation of copper prices in the United States. (*Global Minerals*, *supra*, 113 Cal.App.4th at pp. 842–843; *J. P. Morgan*, *supra*, 113 Cal.App.4th at p. 203.) In finding nationwide class certification to be improper, this court concluded: (1) there were potential conflicts of interest among the proposed class members because they acted in different capacities as both buyers and sellers of copper products in various transactions, and there was a question whether the overcharges were passed on to the next purchaser; (2) there was insufficient evidence of causation or classwide injury, because there was no showing that changes in COMEX prices necessarily caused changes in the physical or cash copper markets; (3) there were material variations between California law and the laws of other states which made a nationwide class unmanageable; and (4) the *Global Minerals* class was not readily ascertainable because it was vague and overbroad. (*Global Minerals*, *supra*, 113 Cal.App.4th at pp. 850–860; *J. P. Morgan*, *supra*, 113 Cal.App.4th at p. 212–223.)

Both *Global Minerals* and *J. P. Morgan* recognized the general rule, stated in *Rosack*, *supra*, 131 Cal.App.3d at page 753, and *B.W.I.*, *supra*, 191 Cal.App.3d at pages 1350–1351, that "for class certification purposes, if the plaintiffs can establish a conspiracy to fix prices, and that they purchased the affected goods or services, the fact of injury or impact of the conspiracy can be treated as a common question." (*J. P. Morgan*, *supra*, 113 Cal.App.4th at p. 215; see *Global Minerals*, *supra*, 113 Cal.App.4th at p. 853.) *Global Minerals* and *J. P. Morgan* also acknowledged that courts in appropriate cases may assume that consumers who purchased products in an anticompetitive

market were injured by having to pay higher prices. (*Global Minerals, supra,* 113 Cal.App.4th at p. 853; *J. P. Morgan, supra,* 113 Cal.App.4th at p. 216.)

However, the court in *Global Minerals* and *J. P. Morgan* declined to apply this assumption to the particular facts of those cases, because of the unique peculiarities of the copper market and the dual roles played by members of the class as both buyers and sellers. (*Global Minerals, supra,* 113 Cal.App.4th at p. 853; *J. P. Morgan, supra,* 113 Cal.App.4th at p. 215.) The court explained: "[I]n a case in which the subject product was substantially altered or added to when it was received by a middleman from the manufacturer, the effects of any price-fixing by the manufacturer will be obscured and classwide proof of injury will be more difficult. [Citation.] The latter facts fit this case more closely." (*Global Minerals, supra,* 113 Cal.App.4th at p. 855; *J. P. Morgan, supra,* 113 Cal.App.4th at p. 216.)

None of the relevant factors that precluded class certification in *Global Minerals* and *J. P. Morgan* are present in this case. The class members here did not act as both buyers and sellers of Cipro; they all paid for Cipro at the end of the distribution line. This is not a case where the product was substantially altered or added to by a middleman, thereby obscuring the effects of any price-fixing. Further, unlike the plaintiffs' economist in *Global Minerals* and *J. P. Morgan,* who merely "assumed causation of injury for purposes of his analysis" (*Global Minerals, supra,* 113 Cal.App.4th at p. 856; *J. P. Morgan, supra,* 113 Cal.App.4th at p. 217), plaintiffs' expert here rendered a considered opinion on the subject. Finally, this case does not present issues of conflicting state laws or ascertainability of the class.

The trial court is in the best position to weigh the advantages of class treatment against its disadvantages. (*Linder, supra,* 23 Cal.4th at p. 435.) The trial court here correctly recognized that there are substantial benefits to be gained from classwide adjudication of the common legal and factual questions relating to the legality of the Cipro Agreements, the effect of the Cipro Agreements on the market for ciprofloxacin, and the aggregate impact on the class as a whole. Requiring individual purchasers of Cipro to litigate these common questions separately would be inefficient and wasteful of judicial resources, and could potentially result in conflicting judgments. (*Terazosin, supra,* 220 F.R.D. at pp. 699–701; *Lorazepam, supra,* 202 F.R.D. at p. 31.) Further, many individual purchasers of Cipro would not have an economic incentive to litigate these issues on their own. (See *Linder, supra,* 23 Cal.4th at p. 435 [noting that the benefits of class actions include eliminating the possibility of repetitious litigation and providing a method of redress for those who have suffered injury of insufficient size to warrant individual action].)

■ The trial court also acted within its discretion in concluding that individual issues pertaining to injury and damages would be manageable within the context of such a class action. (Cf. *Terazosin, supra*, 220 F.R.D. at p. 701 [rejecting argument that similar class action was "unmanageable" and concluding that the challenges of managing such a class "are ones that routinely arise in complex litigation, and they are insufficient to overcome the innumerable advantages that class treatment will afford"].) In a class action, the court may address any individual damages issues by devising remedial procedures to make determinations pertaining to each class member's right to recovery. (*Employment Development Dept. v. Superior Court, supra*, 30 Cal.3d at p. 266.) "A bifurcated trial, subclasses, and other methods may be employed to simplify the proceedings." (*B.W.I., supra*, 191 Cal.App.3d at p. 1354.)

■ If the defendant in a class action is found liable, and there is a finding at trial as to the amount of classwide damages, each class member's individual entitlement to damages may be litigated in a nonadversary administrative claims procedure with a lowered standard of proof. (*State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564]; *Bell, supra*, 115 Cal.App.4th at p. 759.) In such a claims procedure, the allocation of the total sum of damages among the individual class members " 'is an internal class accounting question that does not directly concern the defendant . . . .' " (*Bell, supra*, 115 Cal.App.4th at p. 759, quoting 2 Conte & Newberg, Newberg on Class Actions, *supra*, § 4:26, p. 233; see also *Bruno v. Superior Court, supra*, 127 Cal.App.3d at p. 129 ["A class action which affords due process of law to the defendant through the time when the amount of his liability is calculated cannot suddenly deprive him of his constitutional rights because of the way the damages are distributed"].)

■ Contrary to petitioners' contentions, such a claims procedure would not necessarily require burdensome inquiries into matters such as which specific class members would have switched to a generic drug in a hypothetical world, which would have remained brand-loyal, and precisely how much money each individual class member lost as a result of Bayer's alleged monopoly on ciprofloxacin. Such a requirement of "individualized proof of damages, if accepted, would challenge all class action judgments adopting reasonably expeditious means of distributing the recovery among class members." (*Bell, supra*, 115 Cal.App.4th at p. 750.) State and federal courts

alike have adopted a more pragmatic approach of allowing damages to be distributed to individual class members based on averages, statistical sampling, extrapolation, or other similar approximations. (*Id.* at pp. 750–751; 3 Conte & Newberg, Newberg on Class Actions, *supra*, § 10:12, pp. 505–509.) It is within the trial court's discretion to weigh the inherent imperfections of such approximations against the vindication of important statutory policies and the burden to the courts of proving damages on a strictly individual basis. (*Bell, supra,* 115 Cal.App.4th at p. 751.)

We therefore conclude that the trial court acted within its discretion in determining that the issues which may be jointly tried, when compared with those requiring separate adjudication, are sufficiently numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants. (*Collins v. Rocha, supra,* 7 Cal.3d at p. 238.)

However, the class as defined by the trial court is overbroad, because it includes purchasers of Cipro who paid a flat copayment for the drug and who would have paid the same amount for a generic substitute under the terms of their health insurance coverage. Although "[t]he fact that certain members of the class may not have been injured at all does not defeat class certification" (*Rosack, supra,* 131 Cal.App.3d at p. 754), we can perceive no reason to include within the class a sizeable segment of consumers who could not have been harmed and who could easily be excluded from the class definition. Other courts in similar cases have excluded flat copayers from the class definition. (See, e.g., *Terazosin, supra,* 220 F.R.D. at pp. 692–693; *Cardizem, supra,* 200 F.R.D. at p. 347.) The trial court should define the class to exclude flat copayers from the class.

## III

## CONCLUSION

■   The trial court did not abuse its discretion in certifying a class. Substantial evidence supports the trial court's finding that questions of law or fact common to the class predominate over the questions affecting the individual members. The trial court applied the correct legal criteria in certifying the class, and it did not misapply applicable legal principles. The questions common to the class are sufficiently numerous or substantial in comparison to the individual questions that the maintenance of a class action would be advantageous to the judicial process and to the litigants. However, the class certification order is overbroad because it includes flat copayers who would have paid the same price for a generic substitute.

## IV

## DISPOSITION

Let a writ of mandate issue directing the superior court to modify its order granting class certification so as to exclude all purchasers of Cipro who paid a flat copayment and who would have paid the same copayment for a generic substitute under the terms of their heath insurance coverage. In all other respects, the petition is denied. The parties are to bear their own costs in this writ proceeding.

Huffman, Acting P. J., and Nares, J., concurred.